**In re Timothy Michael WEIR and Ann Elizabeth Weir, Debtors.**

Bankruptcy No. 94–20727–C–7.

United States Bankruptcy Court, E.D. California.

Oct. 18, 1994.

---

John D. Bessey, Law Offices of John D. Bessey, Sacramento, CA, for debtors.

Edward Russell, Law Offices of James G. Schwartz, Pleasanton, CA, for Sears, Roebuck and Co.

## OPINION

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

Is there any bite in the Bankruptcy Code's toothless tiger, 11 U.S.C. § 521(2)? Consumer debtors who are not in default on secured consumer debts sometimes flout the mandate in section 521(2) that they state (and perform) an intention to reaffirm the

debt, surrender the collateral, or redeem the collateral by paying its value. Instead, debtors who are not otherwise in default say they will "remain current" on payments without reaffirming. Here, a secured creditor contests that tactic as not authorized by the statute; and the question becomes what to do.

Four courts of appeals are evenly divided on the permissibility of a nondefaulting debtor remaining current without reaffirming. Dozens of lower courts are similarly deadlocked. Ten years of inconclusive and not-very-helpful debate suggests that it is time to approach the problem from a different perspective and ask whether the answer matters.

The better question to ask is "what difference does it make?" This question looks beyond the point that has been debated, assumes that the debtor's strategy is impermissible, and focuses on the remedies available to the creditor of a nondefaulting debtor who fails to reaffirm the underlying obligation.

I conclude: (1) the primary bankruptcy remedy is relief from the automatic stay; (2) bankruptcy law provides no other practicable remedy against a nondefaulting debtor who elects to remain current and disobeys the command to reaffirm, redeem, or surrender; and (3) the parties must look to nonbankruptcy law for other remedies. In the absence of a default under nonbankruptcy law, relief from the automatic stay will be small solace to a secured creditor. In other words, much ado about nothing.

## FACTS

The debtors use a charge account with Sears to purchase typical consumer goods.[1] Sears has carefully drafted its credit agreements and sales documents to retain a purchase money security interest in goods purchased on the account, but has not defined default to include bankruptcy.

The debtors have always made their required monthly payments. They filed Official Form No. 8, Chapter 7 Individual Debtor's Statement of Intention ("statement of

intention"), selected none of the alternatives listed on the form, and instead stated that they intended to remain current on the Sears account. They still decline to reaffirm the debt or surrender or redeem the collateral.

Sears objects and asks the court to fashion a remedy to make up for the absence of any specific remedy in the Bankruptcy Code. Its only suggestion is that the case should be "dismissed as to Sears only."

Sears concedes that it would be futile to grant relief from the automatic stay because it can do nothing to proceed against the collateral under applicable nonbankruptcy (California) law so long as the debtors remain current on their payments.

## DISCUSSION

### I

Analysis begins with positing the statutory language that created the debtors' obligation to file a statement of intention and make good on that intention and then comparing it with the language that was rejected before setting forth its involuted legislative history.

Section 521(2) was added to the law in 1984 as part of legislation that cleared a six-year congressional logjam following enactment of the Bankruptcy Code. It provided:

(2) if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate—

(A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, or within such additional time as the court, for cause, within such period fixes, the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property;

---

1. The primary purchases, a telephone, two vacuum cleaners (one broke and had to be replaced), and a VCR, were made over an eighteen-month period ending seven months before bankruptcy.

(B) within forty-five days after the filing of a notice of intent under this section, or within such additional time as the court, for cause, within such forty-five day period fixes, the debtor shall perform his intention with respect to such property, as specified by subparagraph (A) of this paragraph; and

(C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title; ....

11 U.S.C. § 521(2).[2]

Juxtaposing what was rejected against what was enacted is revealing. The Senate twice passed a version of the statement of intention that was far less opaque:

[Proposed § 521(a)(4) ] if the debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate, the debtor shall file and serve, within thirty days after the filing of a petition under chapter 7 of this title but no later than five days before the first meeting of creditors, upon each creditor holding such security and the trustee, a statement expressing the debtor's intention with respect to retention or surrender of the collateral and, if applicable, specifying that the collateral is claimed as exempt, that the debtor intends to redeem the collateral, or that the debtor intends to reaffirm debts secured by the collateral; [Proposed § 521(b) ] At or before the conclusion of the meeting of creditors provided for by section 341 of this title, or upon such other date as the court in a specific case and in the exercise of its equitable powers may fix, the debtor shall perform his intention with regard to secured creditors, as specified by paragraph (3) of subsection (a), by surrendering such property to the creditor or the trustee; redeeming such property by paying the redemption price, or confirming his intention to pay such price pursuant to section 722(b); or by reaffirming the debt. If the debtor has not fully performed his obligations under paragraph [4] of subsection (a) and this subsection at or before the meeting of creditors, the stay imposed by section 362(a) of this title shall terminate with respect to the enforcement of liens against such property, unless the court orders otherwise.

S. 445, 98th Cong., 1st Sess. § 207 (1983) (as passed by the Senate on April 27, 1983, but not enacted).[3]

It is evident that section 521(2) bears scars from crippling wounds suffered in hard-fought battles. Its text is so enigmatic, particularly in light of the rejected version, that the most that can be said in its defense is that the Congress settled upon a calculated ambiguity to resolve an intractable difference of opinion.

### A

Now, some history. The years between 1978 and 1984 witnessed intense lobbying for amendments by, and an epic stiff-arm of, the consumer credit industry, which thought itself sandbagged in the closing moments of the 95th Congress when an obscure, hasty, but exquisitely-timed procedural maneuver was used to enact the Bankruptcy Reform Act of 1978 without running the gauntlet of the usual House–Senate conference.

The consumer credit industry prepared substantive amendments to add to the technical corrections bill that was supposed to be presented early in 1979 to clean up the Bank-

---

2. In a related provision, the trustee is required to:

(3) ensure that the debtor shall perform his intention as specified in section 521(2)(B) of this title;

11 U.S.C. § 704(3).

The trustee is not given any specific means for accomplishing this assignment. As will be discussed below, this provision originated in the House of Representatives. The Senate version that was rejected did not impose such a duty on the trustee.

3. A related provision that similarly failed to be enacted would have brought the bankruptcy judge into the meeting of creditors:

[Proposed section 341(c) ] The court shall convene, and may preside at any ·meeting under this section. The court shall also perform such judicial duties as may be required under other provisions of this title promptly in conjunction with the. meeting.

S. 445, 98th Cong., 1st Sess. § 205 (1983) (as passed by the Senate on April 27, 1983, but not enacted).

ruptcy Reform Act's numerous errors of haste[4]—spelling, grammar, punctuation, and minor technical points—or to add to any other bankruptcy legislation that had a possibility of being enacted.

House Judiciary Committee leaders, who opposed the consumer credit amendments and other special interest provisions, bottled up essentially all bankruptcy legislation for years rather than risk having amendments added to some other bankruptcy bill that might clear the committee.[5]

The logjam was momentous, and the proposed consumer credit amendments, including the statement of intention, were at center stage. They had powerful supporters and a well-financed lobby behind them. And there were powerful, equally-determined enemies within the Congress. Impasse ensued.

Ultimately, two Supreme Court decisions forced the hand of the opponents. First, in 1982, the Court held that the 1978 Code unconstitutionally allocated jurisdiction over certain bankruptcy matters to judges who lacked Article III status. *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). The ensuing disagreement about whether bankruptcy judges should become Article III judges only intensified the logjam. Meanwhile, the bankruptcy system gimped along under the so-called Emergency Rule that was cobbled together to avert chaos until the Congress could resolve the matter.

The time for bankruptcy amendments finally arrived in February 1984, when the Court held that collective bargaining agreements could be rejected in reorganization cases. *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Organized labor immediately entered the fray, and the balance of politics shifted decisively.

After *Bildisco,* the demand for bankruptcy amendments could no longer be resisted. In any such legislation, the various interest groups that had been vying for amendments could no longer be denied.

The consumer credit amendments that were ultimately enacted were not the same as in Senate Bill 445 or other similar measures that had passed the Senate. Rather, they were introduced by the House Judiciary Committee leadership as House Resolution 5174, a rearguard action in the face of the inevitable that was designed to minimize the damage and that purported to reflect a compromise with the consumer credit industry.

Thus, the relatively accessible legislative history of Senate Bill 445, while essential background for divining the meaning of section 521(2), is of limited assistance because the language of the section finally enacted differs greatly. The more elusive legislative history of House Resolution 5174 has been elucidated in a treatise on reaffirmation and redemption. R. Hessling, Reaffirmation and Redemption at 92–129 (1994).

1

In the Senate, the key battles were fought in the Judiciary Committee where Senators Kennedy and Metzenbaum led the opposition. As chronicled in Senate Report No. 98–65, the consumer credit amendments were initially introduced in 1981 as part of Senate Bill 2000, which was reported out of committee with two negative votes but was not passed by the full Senate. They were reintroduced in the 98th Congress as Senate Bill 445. S.Rep. No. 98–65, 98th Cong., 1st Sess. 1–2 (1983).

Senators Kennedy and Metzenbaum ultimately, albeit reluctantly,[6] agreed to Senate Bill 445, having, in the euphemisms of the committee report, "played a critical role in

---

**4.** Since Title 11 was enacted positive law, there was no code revisor to clean up the mess.

**5.** The warring parties agreed to occasional safe conduct passes. Thus, perceived threats to proper functioning of the securities and commodities markets enabled the amendments to stockbroker and commodity broker liquidation provisions to slip through unmolested with support from, among others, the Securities and Exchange Commission, Commodity Futures Trading Commis-

sion, Securities Investor Protection Corporation, and Board of Governors of the Federal Reserve. Act of July 27, 1982, Pub.L. 97–222, 96 Stat. 235 (codified as amended in scattered sections of 11 U.S.C.).

**6.** *See* S.Rep. No. 98–65, 98th Cong., 1st Sess. 90–91 (1983) (additional views of Messrs. Kennedy and Metzenbaum).

shaping the legislation and in developing moderating language enhancing protections for debtors affected by changes in the law provided for in the bill." *Id.* at 2.[7]

The version of section 521 that cleared the Senate in Senate Bill 445 had two key features. First, the statement of intention had to be filed before the first meeting of creditors.[8] Second, the automatic stay would, absent contrary court order, terminate if the debtor had not fully performed the stated intention by the conclusion of the meeting of creditors.[9] That self-executing termination of the automatic stay was eliminated before enactment. If the Senate version had been enacted, secured creditors would be able to settle their rights or enforce their liens early in a case.[10]

2

The legislative history of House Resolution 5174 in the House of Representatives is scattered. The measure was introduced by Judiciary Committee chairman Rodino on March 19, 1984, twenty-five days after the Supreme Court's *Bildisco* decision. It included the consumer credit amendments as a separate subtitle and was described as reflecting a compromise with representatives of the consumer credit industry.[11] Section 521(2) was one of the provisions in the compromise that ultimately became law.

Section 521(2) in House Resolution 5174 differed from the Senate's proposed sections 521(a)(4) and 521(b) in several respects. Where the Senate would have required the debtor to complete performance by the first meeting of creditors, the House version gave

---

**7.** They added, in a separate statement, that:

In recognition of the fact that S. 445 went too far in tipping the balance against debtors, the bill was significantly modified during its two years of committee consideration. While we are not completely satisfied with the bill as amended by the committee, some of its worst aspects have been eliminated.

. . . . .

In our opinion, the bill as finally reported, still *tips the balance unnecessarily in favor of the creditors....* If legislation is to be enacted, however, we are satisfied that the bill as reported is a significant improvement over the measure that was originally introduced in the 96th Congress.

S.Rep. No. 98–65, 98th Cong., 1st Sess. 90–91 (1983) (additional views of Messrs. Kennedy and Metzenbaum).

**8.** Proposed section 521(a)(4).

**9.** Proposed section 521(b).

**10.** The Senate Report describes the provision as follows:

The new section 521(a)(4) created by subsection (a) of section 207 contains provisions dealing with the disposition of property of the debtor which is subject to a security interest or lien. When the debtor files a bankruptcy petition, property which is security for consumer debts is almost invariably in the hands of the debtor. Usually, such property will be claimed as exempt, or will be abandoned by the trustee as being of little or no value to the estate. Although the 1978 Code seemed to require the property to be delivered to the trustee, and then delivered by the trustee to either the debtor or a secured creditor, *testimony in hearings* held on this section showed that this often did

not occur. Instead, under the Reform Act provisions, the property frequently simply remained in the debtor's possession.

The debtor has several options with respect to such property. The debtor may claim the property as wholly or partially exempt, may seek to redeem the property, or may seek to retain the property by reaffirming all or part of the underlying debt. Or, the debtor may decide to surrender the property to the secured creditor.

The provision recognizes that secured creditors have a substantial interest in such property. Accordingly, the debtor would be required to notify the secured creditor what he intends to do with the property within 10 days after the petition, and then, to perform his stated intention by the time of the meeting of creditors. If the debtor has not performed his intention by the meeting, the secured creditor is then free to enforce its lien. In situations where there is a dispute over the respective rights of debtor and secured creditor, or in the rare case where the trustee will assert an interest of the estate in such property, the court may order the status quo to be maintained until any disputed matters are resolved.

Subsection (a)(5) complements the amendments made in § 205—that the bankruptcy judge convene the meeting of creditors. Taken together, these amendments encourage the debtor and creditor to settle issues involving secured debt without judicial proceedings, but also enable the parties to identify disputed matters at an early stage so they may be resolved at the meeting of creditors. This will avoid the time and expense of separate and delayed proceedings.

S.Rep. No. 98–65, at 57–58.

**11.** 130 Cong.Rec. 5858; R. Hassling, at 119.

the debtor up to thirty days or, if earlier, the day of the meeting of creditors, in which to file the statement of intention and then permitted an additional forty-five days in which to perform the stated intent.[12] The trustee was assigned the duty of ensuring that the debtor actually perform the stated intention. And, most significant, the enforcement mechanism of automatic relief from the automatic stay was eliminated.

House Resolution 5174 passed the House on March 21, 1984.[13] Although the Senate passed House Resolution 5174 on June 19, 1984, it deleted the House's consumer credit amendments in their entirety and substituted its own consumer credit amendments from Senate Bill 445 in their stead.[14] A House–Senate conference accepted the House version of the consumer credit amendments. The conference report was agreed to on June 29, 1984. The President signed House Resolution 5174 on July 10, 1984.

The floor statements supporting final enactment of the compromise fashioned in the House–Senate conference emphasized that the House version of the consumer credit amendments was being accepted. The floor statements are replete with remarks indicative of the frustration and deadlock that had permeated the whole affair.[15] But there is little guidance as to how the consumer credit provisions, including section 521(1), were intended to function.

B.

The legislative history indicates that the process was one of long-term deadlock and begrudging compromise. Only two things are clear about the statement of intention. First, the Senate designed a self-executing remedy by providing that the automatic stay would terminate unless the debtor either performed the stated intention before the meeting of creditors or persuaded the court to prolong the stay. Second, by eliminating the

**12.** The forty-five day period for performing the stated intention actually operated to assure that performance would *never* be required until after the first date set for the meeting of creditors. Under the rule in effect at the time, the meeting was required to be set not later than forty days after filing a voluntary petition. Fed.R.Bankr.P. 2003(a) advisory committee's note to 1987 amendment. An exception has now crept in, permitting the meeting to be as late as sixty days after filing if the meeting is at a location not regularly staffed by the U.S. trustee. Fed. R.Bankr.P. 2003(a).

**13.** 130 Cong.Rec. 6249.

**14.** 130 Cong.Rec. 17,158.

**15.** The floor statements appear in the June 29, 1984, issue of the *Congressional Record.* 130 Cong.Rec. 20,224–20,234. Illustrative snippets follow.
First, the chairman of the Judiciary Committee, Mr. Rodino:
Mr. Speaker, today, to the surprise, amazement and relief of many, I am sure, if not all, I rise to take up the result of the conference....
130 Cong.Rec. 20,224.
Then, the chairman of the Judiciary subcommittee responsible for bankruptcy legislation, Mr. Edwards:
Mr. Speaker, the conference report on H.R. 5174, Bankruptcy Amendments of 1984, is regrettable, at best. It ignores over a decade of study on this issue and creates a maze for debtors, creditors, and their lawyers who participate in the bankruptcy process. Even more

regrettable, we must approve this conference report today, lest we plunge the bankruptcy system into further chaos because of the expiration of the transition provision under the 1978 bankruptcy legislation on Wednesday, June 27.
130 Cong.Rec. 20,225.
Another key Judiciary Committee figure was Mr. Kastenmeier:
In my view this conference report presents the legislative process at its best and at its worst. I am pleased that we were able to fashion a constitutional, workable bankruptcy court system. On the other hand, the use of the bankruptcy court bill as a vehicle for other reforms, no matter how meritorious, is to be lamented, as my chairman has steadfastly maintained.
130 Cong.Rec. 20,227.
Mr. Sawyer spoke as one who was not a Judiciary Committee insider:
We also [had] a number of consumer and creditor problems that were absolutely denied us being addressed in the House by the leadership in the House; ....
130 Cong.Rec. 20,228.
Mr. Hyde was even more outspoken:
This issue of bankruptcy reform has been with us for years—unfortunately—and we have had to fight for the right to hold hearings on matters contained in legislation passed by the other body on several occasions. Once we were forced by circumstances to face the issue, and those on the House conference met with members of the Senate conference, a solution to the omnibus package was forged.
130 Cong.Rec. 20,230.

automatic termination of the stay and disconnecting performance of the intention from the meeting of creditors, the House eviscerated the Senate's remedy.[16]

In view of this legislative history, it should come as no surprise that section 521(2) is written in mud. To some, it is disgraceful draftsmanship. To others, it is inspired tergiversation. Whatever, the provision smacks of compromise and calculated ambiguity.

Two unresolved issues fester in section 521(2): (1) whether the three named choices—affirm, redeem, or surrender—are exclusive of all other possibilities, including doing nothing other than remaining current on the debt; and (2) whether a creditor has any remedy when the debtor fails to comply.

### III

Mindful that the narrow question is whether there is a *remedy* for flouting section 521(2), it is necessary first to describe how the divided courts have dealt with the controversy regarding the unmentioned alternative of remaining current on payments without reaffirming.

The courts of appeals in four circuits have split 2–2 on the question whether the debtor may retain property without reaffirming under section 524(c) or redeeming the collateral under section 722. Lower courts are also divided, with the majority favoring the positions of the Fourth and Tenth Circuits. R. Hessling, Reaffirmation & Redemption § 4–5 (1994) (cataloging cases).

The Seventh and Eleventh Circuits hold that debtors must choose to reaffirm the debt or redeem, or surrender the collateral and nothing else. *Taylor v. AGE Federal Credit Union (In re Taylor)*, 3 F.3d 1512 (11th Cir.1993); *In re Edwards*, 901 F.2d 1383 (7th Cir.1990).

According to the Seventh Circuit in *Edwards*: the obligations created by section 521(2) are mandatory and unambiguous; allowing property to be retained amounts to a de facto reaffirmation that violates section 524(c) because it is not voluntary as to the creditor; and the legislative intent behind the 1984 amendments was to "protect creditors from the risks of quickly depreciating assets and to keep credit costs from escalating because of the too-ready availability of discharge." *Id.* at 1386.

The Eleventh Circuit in *Taylor* similarly finds section 521(2) unambiguous and not open to analysis that undermines the reaffirmation and redemption processes. Retention without reaffirmation or redemption would, according to *Taylor*, transform recourse debt into nonrecourse debt because the debtor would be discharged from the debt as a personal obligation.

The Fourth and Tenth Circuits see it differently. *Lowry Federal Credit Union v. West*, 882 F.2d 1543 (10th Cir.1989); *Homeowners Funding Corp. v. Belanger (In re Belanger)*, 962 F.2d 345 (4th Cir.1992). The Tenth Circuit agrees that the statute prescribes only three options but notes that nothing in the Bankruptcy Code ties the right to retain collateral to redemption or reaffirmation and that there is no specific remedy, such as an automatic right to repossess. In the absence of any showing of actual prejudice under the facts of the case, the *Lowry* court declined to upset the bankruptcy court's injunction that permitted the debtors to retain an automobile so long as they made their regular payments and maintained insurance notwithstanding a so-called *ipso facto* clause in the underlying agreement that made bankruptcy an event of default.[17]

The Fourth Circuit in *Belanger* does not see the three options as excluding the further

---

16. It can be argued that there is a third item of certainty—the House's version, which ultimately was accepted by the Senate, was neither designed nor intended to expand creditors' rights beyond what the Senate had proposed. But that is less certain because it can be argued that the Senate gave up definite automatic termination of the automatic stay in favor of ambiguous language that would permit the discharge to be denied under 11 U.S.C. § 727(a)(6)(A) if the debt-or failed to comply with a court order to do something under section 521(2).

17. The court expressly stated that it could still be persuaded by evidence of actual prejudice that the creditor was being harmed by the injunction forbidding repossession and made plain that it was not deciding whether *ipso facto* clauses are enforceable.

alternative of retaining the property and remaining current on the debt. It sees the phrase "if applicable" at 11 U.S.C. § 521(2)(A) as having meaning only if the unnamed alternative is indeed permissible. Thus, the *Belanger* court finds the statute unambiguous, like *Taylor* and *Edwards,* but for the opposite proposition and concludes that section 521(2) is satisfied by making a statement that announces an intent to retain the property and remain current on the debt.

## IV

Assuming that section 521(2) forbids an election to remain current on a debt without either reaffirming or redeeming, what remedies can the creditor pursue against the non-defaulting debtor? [18]

Two principles apply. First, any remedy generally available under the Bankruptcy Code, such as relief from stay, can be pressed into service so long as it is suitable to the problem. Second, once beyond the frontier of the standard remedies, more creative solutions attempted by creditors should be assessed with guidance from the four-part *Cort v. Ash* test for an implied private cause of action. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975).[19]

## A

■ Relief from the automatic stay for cause is plainly permitted. 11 U.S.C. § 362(d)(1); R. Hessling, § 4–8 at 391–92. Indeed, automatic termination of the automatic stay was the remedy intended by the proponents of the statement of intention. Elimination of the proposed automatic termination feature did not undermine the applicability of the basic provisions relating to relief from stay.

■ Violation of section 521(2) serves as a prima facie basis for a finding of cause for relief from stay. The debtor would, as the party opposing relief, have the burden of proof on all issues relating to cause. 11 U.S.C. § 362(g)(2). One recognized defense to a motion for relief is that the debtor needs a reasonable time in which to redeem or reaffirm. R. Hessling, § 4–8, at 392; *In re Chavarria,* 117 B.R. 582, 585 n. 3 (Bankr.D.Idaho 1990). The trustee, who has a titular statutory duty to ensure that the debtor performs the intention, might even be obliged to support the creditor's motion if there is no value to be realized for the estate. 11 U.S.C. § 704(3).

The problem with relief from stay from the creditor's standpoint is that relief merely permits the creditor to enforce its rights under state law. If the debtor is in default, the creditor must follow the procedures established by state law for enforcing its rights in the collateral. Where, however, there is no default, the state law hurdle becomes insurmountable.

Sears concedes in this instance that the debtor is not in default under state law. Accordingly, relief from stay would be small solace, and Sears does not seek it.

## B

Bankruptcy's version of the All Writs statute, 11 U.S.C. § 105(a), has some utility. The court could, on motion, direct the debtor to choose between reaffirmation, redemption, or surrender as an order "that is necessary

---

**18.** Once again, it is assumed for purposes of analysis that the Bankruptcy Code forbids retaining property without reaffirming the underlying debt.

**19.** The focus is on whether the Congress intended to make a private remedy available and whether the Congress intended to create the specific remedy sought in the case. *Suter v. Artist M.,* —— U.S. ——, ——, 112 S.Ct. 1360, 1370, 118 L.Ed.2d 1 (1992). The specific test is:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort,* 422 U.S. at 78, 95 S.Ct. at 2088 (emphasis in original) (citations omitted).

or appropriate to carry out the provisions" of title 11.[20]

If the debtor does not comply with a court order, there are, in principle, two remedies—denial of discharge and contempt.[21] Both remedies, however, pose difficult questions if forcefully pursued against a nondefaulting debtor.

1

█ The court may deny a discharge if the debtor refuses to obey any lawful order of the court other than an order to respond to a material question or to testify. 11 U.S.C. § 727(a)(6)(A). An appropriate order from the court requiring the debtor to state an intention to reaffirm or to redeem or to surrender would constitute a lawful order of the court pursuant to section 727(a)(6)(A). When, however, the debtor does fail to comply with an order of the court, the court should use discretion and consider whether a denial of discharge is appropriate under all the facts and circumstances of the case.

It should come as no surprise that no reported case has denied a discharge on account of failure to comply with an order to comply with section 521(2). Denial of a discharge to a debtor who is paying a bill seems disproportionate to the transgression and renders the remedy impracticable.

2

█ Contempt is also available whenever a court order is violated. Civil contempt permits coercive fines that are remedial in nature. Thus, the debtor potentially could be fined a fixed number of dollars per day (or locked up) for each day that the debtor does not comply with the order.

█ Contempt, however, is serious business that warrants caution and the exercise of wise discretion. Holding a debtor who is paying his bill in contempt seems as disproportionate as denying a discharge and renders the remedy impracticable.

C

█ Dismissal of the case on the basis of unreasonable delay by the debtor that is prejudicial to creditors is authorized by 11 U.S.C. § 707(a)(1) and has been employed for violation of the section 521(2) requirements. *In re Green*, 119 B.R. 72, 73–74 (Bankr. D.Md.1990).

The impracticability of employing section 707(a)(1) as a basis for a remedy against a nondefaulting debtor is that a creditor who is being paid regularly and on time will have difficulty demonstrating prejudice. *Cf. Lowry*, 882 F.2d at 1546 (the debtor's filing of a petition, without more, does not prejudice a creditor).

D

█ Nondischargeability is what Sears seeks in this instance under the guise of its

---

**20.** Although such motions have been entertained, *e.g., Taylor*, 3 F.3d at 1514–17; *In re Griffin*, 143 B.R. 535, 537 (Bankr.E.D.Ark.1991); *In re Chavarria*, 117 B.R. at 584–85, there is the little-examined problem of standing. The trustee, who has a duty imposed by section 704(3) to enforce section 521(2), certainly may bring such a motion. The creditor's right to do so, however, may be questioned. The specific assignment of responsibility to the trustee also suggests that creditors are not empowered to move for an order enforcing section 521. The facts of this case, however, do not necessitate a decision on that question.

**21.** A third possibility, in principle, would be to defer entering the discharge until the debtor reaffirms or redeems or surrenders. That possibility, which is suggested by the ban on post-discharge reaffirmations at 11 U.S.C. § 524(c)(1), is foreclosed by the rule of procedure that only a debtor may seek deferral of discharge to permit reaffirmations:

Notwithstanding the foregoing, on motion of the debtor, the court may defer the entry of an order granting a discharge for 30 days and, on motion within such period, the court may defer entry of the order to a date certain.

Fed.R.Bankr.P. 4004(c).

The drafters of the rule clarified that the purpose of this provision was to enhance the ability of the "debtor to settle pending litigation to determine the dischargeability of a debt and execute a reaffirmation agreement as part of a settlement." Fed.R.Bankr.P. 4004(c) advisory committee's note.

As suggested above, the subsequent enactment of section 704(3) making it a duty of the trustee to assure that the debtor performs the intention might be viewed as permitting the trustee to make such a motion to defer entry of discharge, but simultaneously suggests that a creditor cannot take the lead.

request that the bankruptcy case be "dismissed as to Sears."

The problem is that no statute specifically authorizes a debt to be held nondischargeable if the debtor fails to comply with section 521(2). Although the court is entitled to issue necessary and appropriate orders to implement the Bankruptcy Code under section 105, that provision is not a general grant of legislative powers to supplement the detailed list of nondischargeable debts specified at 11 U.S.C. § 523(a).

### E

■ To "wait and see" whether the promised regular payments are made is another legitimate alternative for the creditor, particularly in the usual chapter 7 case. This alternative is neither trivial nor impracticable when one takes into account the timing of key bankruptcy events.

The entry of the discharge of an individual debtor terminates the automatic stay protecting the debtor and property of the debtor. 11 U.S.C. § 362(c)(2)(C). It is replaced by a permanent injunction that forbids efforts to collect as a personal liability but which does not bar enforcement of lien rights. 11 U.S.C. § 524(a). Once the discharge is entered, the creditor is free to pursue its in rem rights against property of the debtor, including exempt property.

The chapter 7 discharge ordinarily is issued within one-hundred days after the case is filed.[22] The debtor can perform the statement of intention as late as seventy-five days after the case is filed without being tardy.[23]

Thus, the creditor in the typical chapter 7 case will be able to enforce its lien rights under state law against an individual debtor's property between one and two months after the debtor's deadline to perform the stated intent unless the discharge is delayed by court order or by pendency of litigation affecting the right to a discharge.

Meanwhile, if the debtor is remaining current on the obligation to the creditor, regular monthly payments will be made. Payment is the creditor's ultimate remedy.

If the debtor is not current on payments, the creditor should have little difficulty establishing a default under state law as a predicate to foreclosing upon its lien interest. See U.C.C. §§ 9–501 to –507; Cal.Com.Code §§ 9501–07 (West Supp.1994); § 9508 (West 1990). If, however, there is no default, the creditor may be unable to do anything other than sit quietly and be paid.[24]

### F

■ The four-part Cort v. Ash test for an implied cause of action merits more attention at this point. Cort, 422 U.S. at 78, 95 S.Ct. at 2087–88. Creditors easily satisfy two of the elements because section 521(2) was enacted at the instance of creditors and involves a subject that is not traditionally relegated to state law. But they run afoul of the other two elements.

It cannot be said that there is an indication of legislative intent to create a remedy for violating section 521(2). If anything, the legislative intent that prevailed in the end was

---

**22.** The meeting of creditors is supposed to be set no later than forty days after the order for relief in chapter 7 cases and can be extended to sixty days if held in a remote location not regularly staffed by United States trustees. Fed. R.Bankr.P. 2003(a). The deadline for objecting to discharge in chapter 7 cases is sixty days after the first date set for the meeting of creditors. Fed.R.Bankr.P. 4004(a). The discharge is to be issued to individual chapter 7 debtors promptly after the expiration of the time for objecting to discharge unless either an adversary proceeding objecting to discharge or a motion to dismiss the case as a substantial abuse of chapter 7 is pending or unless the time has been extended to enable the debtor to enter into a reaffirmation agreement. Fed.R.Bankr.P. 4004(c).

**23.** The statutory deadline for performance occurs between forty-five and seventy-five days after filing unless the court extends the time. The statement of intention may be filed up to thirty days after the petition is filed or such longer period as the court fixes for cause. 11 U.S.C. § 521(2)(A). The debtor must perform that intent within forty-five days after filing the statement of intention, or such longer period as the court fixes for cause. 11 U.S.C. § 521(2)(B).

**24.** A question for another day is whether an "ipso facto" clause defining default to include discharge in bankruptcy could be effective notwithstanding 11 U.S.C. § 365. Sears does not have such a clause.

an intent to assure that there was not a remedy.[25]

Nor, can it be said, in view of the Senate's acquiescence to the House's evisceration of the self-executing remedy, that a private remedy is consistent with the underlying purposes of the legislative scheme.

\*   \*   \*

In sum, a creditor's only practicable remedy under the Bankruptcy Code against a nondefaulting debtor for not complying with section 521(2) is relief from the automatic stay. If the bankruptcy court were to grant such a motion, the creditor would then be free to look to its remedies under state law. In the absence of default, however, state law is not likely to be helpful.

The motion to "dismiss the case as to Sears" will be denied as constituting relief that cannot be provided. Sears will have to obtain relief from the automatic stay or await the discharge and the opportunity to enforce its lien rights if and when it can establish a default under state law.

---

**25.** Alternatively, the creation of a trustee's duty to ensure compliance, 11 U.S.C. § 704(3), might permit implication of a remedy for a trustee but not for a debtor.