In re William R. HARRIS and Anita L. Harris, Debtors.

William R. Harris and Anita L. Harris, Appellants,

v.

United States Trustee and Thomas H. Casey, Chapter 7 Trustee, Appellees.

BAP No. CC–01–1423–BKMo.
Bankruptcy No. SA 01–12973–JB.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Feb. 21, 2002.

Filed May 14, 2002.

Allan Dean Epstein, Epstein & Ascher, P.C., Orange, CA, for William and Anita Harris.

Michael Hauser, Office of the United States Trustee, Santa Ana, CA, for U.S. Trustee.

Before BRANDT, KLEIN, and MONTALI, Bankruptcy Judges.

## OPINION

BRANDT, Bankruptcy Judge.

Debtors William R. Harris and Anita L. Harris appeal the bankruptcy court's order dismissing their chapter 7[1] case for substantial abuse under § 707(b). We RE-VERSE, as no evidence supports the bankruptcy court's finding of substantial abuse.

## I. FACTS

The Harrises filed for chapter 7 relief on 10 April 2001, seeking discharge of $122,558 of unsecured nonpriority debt, consisting primarily of credit card debt. Mr. Harris is an attorney, and Mrs. Harris a legal secretary. Their combined net monthly income at filing was $7,422. In 1999 and 2000 the couple's income was $134,000 and $146,000 respectively.

According to Schedule J, the Harrises' total monthly expenses are $7,583. These expenses include $2,890 for housing, $800 for food, lease payments for a 1998 Honda Accord and a 1997 BMW of $654 and $535 each, and additional transportation expenses of $625, not including auto insurance.

On 29 June 2001 the United States Trustee ("UST") moved to dismiss the Harrises' case for substantial abuse under

§ 707(b), alleging that debtors could fund a 36–month chapter 13 plan paying 87% to unsecured creditors by reducing their expenses to the levels set forth in the Internal Revenue Service's Financial Collection Standards (the "IRS standards") (the standards to be used as the "means test" in § 102 of the proposed Bankruptcy Abuse Prevention and Consumer Protection Act of 2001, HR 333, 107th Cong. (2001), the bankruptcy legislation currently pending before Congress).

Debtors opposed, arguing that their expenses were reasonable and necessary for their maintenance and support. In support of their opposition, William R. Harris declared:

1. Debtors began experiencing financial difficulties in the early 1990s when Mrs. Harris quit her job to care for her ill mother. She returned to work after her mother's death in 1995, but in 1996 Mr. Harris lost his job and, despite several job changes over the next few years, was unable to find employment at his previous salary level.

2. The Harrises refinanced their home in July 1998 and used the money to pay down their debts. They sold the home in March 2001, netting approximately $40,000. Because they could not qualify for conventional financing to purchase another home, they entered into a lease option.[2]

3. Mr. Harris' job requires him to drive to court appearances scattered widely across Southern California (for example, in one week, Palm Springs, San Diego, and Van Nuys on successive days, then San

---

1. Absent contrary indication, all section and chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure. "FRE" references are to the Federal Rules of Evidence.

2. The declaration did not explicitly state what debtors did with the proceeds from the sale of their home. At oral argument, counsel indicated debtors used the proceeds (which were exempt under Cal.Civ.Proc.Code §§ 704.730 and 704.960) as a down payment on the lease option.

Diego and Glendale in the same day, and finally Santa Ana on Friday). The couple leased their current vehicles three or four years ago; at the time they believed they could afford the lease payments. After filing their petition, the couple inquired about leasing less expensive vehicles but were told they could not qualify for financing without a one-third down payment.

4. Because Mr. Harris spends so much time on the road, he frequently eats out.

In addition, the Harrises submitted the declaration of their counsel, along with documentation indicating the average price of a home in Orange County, California, to be approximately $350,000.

At the hearing on the UST's motion, the bankruptcy court rejected the use of the IRS standards as a basis for determining whether the debtors' expenses were reasonable. The bankruptcy court made no factual findings on the record, but concluded there was substantial abuse:

> They've chosen their lifestyle and they've chosen to expend their money for their automobiles instead of paying their creditors....
>
> ....
>
> ... I don't think I have any proof that [Mr. Harris] does, in fact, incur all of these except the fact that he has them in his schedules and if these are the expenses, then they're not reasonable for a debtor who is trying to discharge $90,000 of unsecured debt or more....
>
> ....
>
> ... the debtor has not proven that these expenses are reasonable for—especially in light of the fact that after all of these car leases were entered into, that's when all the credit card debt arose. And apparently it arose even after Mrs. Harris was reemployed. And there was no explanation as to why all

that massive credit card debt was incurred at all. No explanation at all....

Transcript, 8 August 2001, pages 2–4.

The bankruptcy court entered an order dismissing the case on 15 August 2001. This appeal ensued.

## II. JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. § 1334 and § 157(b)(1), (b)(2)(A), and (b)(2)(O), and we do under 28 U.S.C. § 158(c).

## III. ISSUE

Whether the bankruptcy court abused its discretion in ordering the dismissal of the Harrises' chapter 7 case for substantial abuse under § 707(b).

## IV. STANDARD OF REVIEW

We review the bankruptcy court's decision to dismiss a chapter 7 case for substantial abuse under § 707(b) for abuse of discretion. *Gomes v. United States Trustee (In re Gomes)*, 220 B.R. 84, 86 (9th Cir. BAP 1998). A bankruptcy court necessarily abuses its discretion if it bases its decision on an erroneous view of the law or clearly erroneous factual findings. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

## V. DISCUSSION

### A. *Applicable Law*

Pursuant to § 707(b),

[a]fter notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the

provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor....

The UST as moving party must establish (1) that the debtor owes primarily consumer debts; and (2) that granting of chapter 7 relief represents a substantial abuse of that chapter. *Gomes,* 220 B.R. at 86. Here, the parties do not dispute that the Harrises' debts are primarily consumer debt; the issue is substantial abuse.

■ The primary factor to be considered in determining whether granting relief would be a substantial abuse is the debtor's ability to fund a chapter 13 plan; in the Ninth Circuit, this factor alone will justify a § 707(b) dismissal. *Zolg v. Kelly (In re Kelly),* 841 F.2d 908, 914 (9th Cir. 1988). In considering this factor, the court may scrutinize the debtor's scheduled expenses and reject or reduce those items that do not appear to be reasonably necessary for the debtor's maintenance or support. *See Kelly,* 841 F.2d at 915 n. 9; *In re Lenartz,* 263 B.R. 331, 336 (Bankr.D.Idaho 2001).

■ Even if a debtor does not have the ability to repay his debts, § 707(b) dismissal may be warranted if bad faith is shown. *Kelly,* 841 F.2d at 915. In determining whether bad faith exists, bankruptcy courts look to the totality of the circumstances. *See, e.g., In re Motaharnia,* 215 B.R. 63 (Bankr.C.D.Cal.1997).

### B. *Presumption/Burden of Proof*

As noted, § 707(b) contains a presumption "in favor of granting the relief requested by the debtor." FRE 301 provides:

> a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption....

■ The presumption may be overcome by a showing that the debtor has the ability to repay debts, or the presence of other factors indicating dishonesty or lack of need. *Motaharnia,* 215 B.R. at 73; *see also In re Mastromarino,* 197 B.R. 171, 177 (Bankr.D.Me.1996) (noting that, if the United States Trustee introduces evidence of ability to pay, demonstrating the schedules do not accurately portray the debtor's circumstances, the presumption vanishes).

In addition, a leading treatise states:

> [T]he statutory presumption is obviously meant to be something more than simply a rule about the burden of proof, since that burden would already have been on the party seeking to dismiss the case.... [I]t appears that the presumption is an indication that in deciding the issue, the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present.

6 Lawrence P. King, *Collier on Bankruptcy,* § 707.04[5][a], at 707–26 (15th ed. rev. 2001).

■ We reject the suggestion that the presumption was intended to require a heightened level of proof of "clear" abuse. The background of the statute is too ambiguous to warrant such a construction without Congress having been explicit that "clear abuse" was to be the standard. The presumption language in § 707(b) cannot be construed in isolation from its antecedent sentence limiting standing to raise the "substantial abuse" question to the court "on its own motion or on a motion by the United States trustee" and forbidding others ("not at the request or suggestion of any party in interest") from doing so. *Id.*

The history of the 1984 amendments that created § 707(b) reveals that it was a defeat for the forces now urging a heightened burden of proof. *In re Weir,* 173 B.R. 682, 685–89 (Bankr.E.D.Cal.1994).

Likewise, the presumption language was not wanted by the proponents of § 707(b). Everything said in *Weir* about how § 521(2) "smacks of compromise and calculated ambiguity" applies equally to § 707(b). *Id.* at 689.[3] Congress did not say that there was a heightened standard of proof, nor do we.

■ In the context in which the court and the U.S. trustee are given the special responsibility to note and raise the § 707(b) issue, it makes sense to remind the trier of fact that, first, even though the court may be in the anomalous position of also being the movant, a case is presumed not to be an abuse of chapter 7 unless and until the question is both raised and decided adversely to the debtor and, second, that "substantial abuse" should only be found by a preponderance of the evidence.

## C. *No Findings*

■ We are hampered by a lack of findings, which are required in contested matters involving disputed issues of fact. *See* Rule 9014; Rule 7052; *Can. Commercial Bank v. Hotel Hollywood (In re Hotel Hollywood)*, 95 B.R. 130, 132–34 (9th Cir. BAP 1988). At oral argument, counsel indicated that the bankruptcy court had issued a tentative ruling, but disagreed as to whether that ruling comprised the court's findings of fact. In any event, we do not consider the tentative ruling, as it is not in the record before us. *See Gertsch v. Johnson & Johnson Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 169 (9th Cir. BAP 1999) (noting that, where the tentative is necessary to understanding the final ruling, it *must* be included in the excerpts of record).

From the hearing transcript, it is not clear whether the bankruptcy court found an ability to repay, bad faith, or both. The court cited debtors' transportation expenses and appeared to question others. The court was also troubled by the fact that debtors had not explained why they had leased two expensive vehicles when they were supposedly experiencing financial difficulties, or why they had incurred "massive" credit card debt. There is no explicit finding that the debtors' housing or food expenses are unreasonable, but the judge seemed to accept the UST's argument that they could rent an apartment in Orange County for about half what they were paying on the lease option. Transcript, page 7.

■ Moreover, the bankruptcy court made no finding of how much debtors could repay were they to convert their case to chapter 13. Although no specific percentage is required, *Gomes*, 220 B.R. at 88, a finding that the debtors could repay at least some meaningful amount is necessary before dismissing for substantial abuse based on ability to repay.

## D. *Ability to Repay/Reasonableness of Expenses*

The Harrises contend there was no evidence to support the bankruptcy court's conclusion that their expenses were unreasonable. We agree.

■ The UST's only evidence was the IRS standards and the schedules, but the bankruptcy court rejected the IRS standards as a measure of reasonableness. This was not error; neither the statute nor case law presently mandates use of those standards in the § 707(b) analysis. More-

---

3. The full quotation is:
In view of this legislative history, it should come as no surprise that section 521(2) is written in mud. To some, it is disgraceful draftsmanship. To others, it is inspired tergiversation. Whatever, the provision smacks of compromise and calculated ambiguity. *Weir*, 173 B.R. at 689.

over, the evidentiary value of the IRS standards is questionable: the UST provided no foundation explaining how the standards were calculated, based on what data, or how current that data might be. The UST analyst's supporting declaration was merely a hearsay reiteration of information obtained from the IRS website.

 Debtors' schedules, the veracity of which was unquestioned, show the level but not the reasonableness (or not) of their expenses. The only evidence regarding reasonableness was the Harris declaration. The bankruptcy court based its conclusion solely on the schedules and its subjective judgment of the Harrises' lifestyle, presumably based on familiarity with the cost of living in Orange County, California. This approach is typical, see, e.g., In re Gyurci, 95 B.R. 639, 643 (Bankr.D.Minn. 1989), and may be appropriate where the court raises the substantial abuse issue sua sponte, see Kelly, 841 F.2d at 917 (noting that the presumption does not place on the judge the burden of producing evidence). Nevertheless, the fact that an expense appears excessive on its face does not excuse the requirement that a court's findings be based on evidence. Treating the judge's familiarity with local conditions as evidence renders any findings essentially unreviewable on the facts. While dismissal for substantial abuse is discretionary, the determination of abuse must be based on factual findings supported by admissible evidence, and not by what amounts to inappropriate judicial notice of the court's own value judgments.[4] There was no such evidence here.

### E. *Bad Faith*

The bankruptcy court appeared to base its finding of substantial abuse in part on the Harrises' failure to explain why they leased expensive vehicles when they were supposedly in financial difficulty, and their failure to explain their massive credit card debt—factors suggesting bad faith. Bad faith is also a factual question. *See Oaks of Woodlake Phase III, Ltd. v. Hall, Bayoutree Assoc., Ltd. (In re Hall, Bayoutree Assocs., Ltd.)*, 939 F.2d 802, 804–05 (9th Cir.1991).

The UST did not argue or present evidence of bad faith: the burden never shifted to the Harrises to explain the leases or the credit card debt, and any finding of bad faith was clear error.

### F. *Possible Plan*

 We may, in the absence of detailed findings, review a trial court's order if a complete understanding of the issues may be obtained from the record as a whole, or if there is no genuine dispute about the facts as to which findings were omitted. *Vance v. Am. Haw. Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir.1986); *Gardenhire v. IRS (In re Gardenhire)*, 220 B.R. 376, 380 (9th Cir. BAP 1998), rev'd on other grounds, 209 F.3d 1145 (9th Cir. 2000).

In so doing, we may search the record for evidence supporting the order because we may affirm for any reason supported by the record. *Dittman v. California*, 191 F.3d 1020, 1027 n. 3 (9th Cir.1999); *Polo Bldg. Group, Inc. v. Rakita (In re Shubov)*, 253 B.R. 540, 547 (9th Cir. BAP 2000). We have done so here.

While the facts of the case suggest that a proper evidentiary showing *might* have supported a finding of substantial abuse,

---

4. "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FRE 201(b).

we believe it would be error to remand where the UST failed to carry its burden. Trial was not a dress rehearsal: the debtors' opposition was well known at the time of trial, and they should be permitted to get on with the chapter 7 case they commenced.

We disagree with the suggestion in the dissent that there is $40,000 (more or less) hidden in the schedules and available to fund a chapter 13 plan. There is far less.

The Harrises have double-counted their $335 per month budgeted to pay their past due taxes. Adding that amount to the $35 per month they concede, the record shows $370 available per month, or $13,320 over the life of a 36–month plan. That $13,320 would be reduced to $5,320 by payment of the $8,000 priority tax debts the Harrises show in their schedule F. While we do not know the chapter 13 trustee's commission, it may be as much as 10% (*see* 28 U.S.C. § 586(e)(1)(B)(i)), thus reducing by another $1,332 (to just under $4,000) the amount available to pay unsecured creditors.

The dissent finds additional money at the expiration of the two car leases. First, it would have Mr. Harris start to drive a twelve-year-old pick-up truck with 125,000 miles on it, worth $1,200, once he returns his BMW to the leasing company. We have no evidence as to the condition of that vehicle or the suitability of it for Mr. Harris to carry out his professional obligations, and we decline to speculate that suddenly $535 more will be available each month. Second, we have no way of knowing how much it will cost the Harrises to replace Mrs. Harris' Honda when it comes off lease in September. This is also pure speculation. Thus, this additional $654 per month (minus an unknown figure) is equally conjectural. We decline to decide that the possibility of confirming a plan that could pay unsecured creditors approximately three and one-half cents on the

dollar ($4,000 divided by $122,558), or perhaps a bit more, amounts to a substantial abuse. Accordingly, we will reverse.

## VI. CONCLUSION

The UST did not present evidence as to the reasonableness of the Harrises' expenses sufficient to support a finding of ability to repay, nor any evidence of bad faith: the presumption in favor of granting relief to the debtors stands. Dismissing the Harrises' bankruptcy case for substantial abuse was an abuse of discretion; we REVERSE.

KLEIN, Bankruptcy Judge, dissenting.

I agree that without findings of fact and conclusions of law this is a difficult record to review. I would nevertheless affirm because the record that we do have enables us to form a complete view of the issues necessary to resolve the appeal. At worst, we should vacate and remand to permit the trial judge to do a better job of explaining himself.

The nub of the matter is that the debtors' schedules, even without making adjustments for unreasonable expenses, are sufficient to support the conclusion that the debtors have the ability to pay a substantial portion of their debt through a chapter 13 plan.

I

First, the ambiguity about whether there were findings may work more against appellants than appellee.

While the record that was made in the hurly-burly of a busy motion calendar appears to be thin on findings, we know that there was a tentative ruling issued in advance of the hearing, which provided the framework for the colloquy at the hearing. The parties did not make the tentative

ruling part of the appellate record, and it does not appear on the court's docket.

We do not know, however, whether that tentative ruling included tentative findings of fact and conclusions of law that may have matured with the court's ruling at the hearing.

If there were findings in that tentative ruling (as there may well have been), then the omission to include them in the appellate record would be charged to appellants, which would entitle us either to dismiss the appeal or to presume that such findings are not helpful to appellants and thence to affirm because appellants have not carried their appellate burden to demonstrate error. *McCarthy v. Prince (In re McCarthy)*, 230 B.R. 414, 417 (9th Cir. BAP 1999).

In other words, it is not altogether clear that the problem was, as the majority concludes, that the U.S. trustee, as movant, did not carry its burden in the trial court. Rather, it may be that the debtors, as appellants, have not carried their burden on appeal to demonstrate error. The tentative ruling plainly existed and plainly formed the matrix for conduct of the hearing. While it is disappointing that counsel for the U.S. trustee did not do a better job of making and protecting a trial and appellate record, the appellate litigation risks associated with omission to make the tentative ruling part of the record are more correctly charged to the appellants.

The first lesson from the standpoint of practical judicial procedure is that a trial court that goes to the trouble of issuing tentative decisions does itself a favor if it takes the additional step of formally placing in the record a copy of any tentative decision that figures in a final decision by, for example, attaching a copy to the civil minutes so that the ruling is accessible in circumstances in which there is no ambiguity about whether it is formally part of the record.

The other lesson is that counsel also has a role in helping to fashion a complete record by, for example, suggesting essential findings that the trial judge may have overlooked that would be needed for purposes of assuring a proper record. Here, the court instructed counsel for the U.S. trustee to lodge an appropriate order. In the interest of protecting the record for appeal, a proficient lawyer would have suggested that the court make omitted findings (in a separate document) consistent with the ruling in open court and could even have proposed specific findings by way of post-trial motion. Fed.R.Civ.P. 52(b), *incorporated by* Fed.R.Bankr.P. 7052.

## II

The majority infers that the trial court could only have found an ability to pay by reducing some of the claimed expenses as unreasonable and then concludes that the necessary underlying factual findings must have been clearly erroneous because there was no evidence probative of reasonableness. I do not agree.

The schedules, which are executed by the debtors under penalty of perjury, are non-hearsay admissions when offered by an adverse party and may be considered in support of a § 707(b) dismissal. Fed. R.Evid. 801(d)(2); *Torgenrud v. Benson (In re Wolcott)*, 194 B.R. 477, 483 (Bankr. D.Mont.1996).

Moreover, the debtors' lawyer made various statements on the record. Everything he said of a factual nature not otherwise supported by evidence that tends to help his clients is, of course, inadmissable and useless as evidence. Conversely, every fact he asserted that could be used to support a finding of "substantial abuse" is a non-hearsay evidentiary admission under

Rule 801(d)(2). *In re Applin,* 108 B.R. 253, 259 (Bankr.E.D.Cal.1989).

The evidence of those schedules, without making any deductions for claimed expenses that are not reasonably necessary, indicates that there would be a sufficient ability to pay a substantial portion of the debt through a chapter 13 (or chapter 11) plan and that we should be affirming the trial court. This evidence is bolstered by counsel's evidentiary admissions.

### A

An appellate court may, in the absence of detailed findings, review a trial court's order if a complete understanding of the issues may be obtained from the record as a whole or if there is no genuine dispute about the facts as to which findings were omitted. *Vance v. Am. Hawaii Cruises, Inc.,* 789 F.2d 790, 792 (9th Cir.1986); *Magna Weld Sales Co. v. Magna Alloys & Research Pty.,* 545 F.2d 668, 671 (9th Cir. 1976); *Gardenhire v. IRS (In re Gardenhire),* 220 B.R. 376, 380 (9th Cir. BAP1998), *rev'd on other grounds,* 209 F.3d 1145 (9th Cir.2000); 9 JAS.WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 52.12[2] (2000); 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2577 (1995).

Moreover, we are entitled to search the evidentiary record for evidence supporting § 707(b) dismissal because we may affirm for any reason supported by the record. *Dittman v. California,* 191 F.3d 1020, 1027 n. 3 (9th Cir.1999); *Polo Bldg. Group v.*

*Rakita (In re Shubov),* 253 B.R. 540, 547 (9th Cir. BAP 2000).

The court was explicit that it was relying on the evidence of the debtors' schedules and declarations provided in support of the debtors' opposition to the motion to dismiss.[5]

### B

The uncontradicted evidence of the debtors' schedules, executed under penalty of perjury, rebuts the debtors' assertion that they could not fund a confirmable chapter 13 plan.

### 1

One starts with Schedules I (Current Income) and J (Current Expenditures).

The debtors have monthly gross income of $11,200 (including a $300 insurance reimbursement) derived from Mr. Harris's employment as a trial lawyer and Mrs. Harris's employment as a legal secretary. That works out to $134,400 per year.

They say their monthly expenses are $7,583, plus $3,778 in payroll deductions for taxes and social security.

Their monthly transportation expenses total $2,018, including $535 for a BMW on a lease expiring in February 2002 (Schedule G) and $654 for a Honda on a lease expiring in August 2002 (Schedule G).[6] Both leases were entered amid financial distress. The operating and insurance expenses for these vehicles, and for the debtors' unencumbered 1990 Mazda pickup truck worth $1,200 (Schedules B and C), are $829 per month.

---

**5.** As the court explained to debtors' counsel: However, it brings to issue the question of whether or not this is an abusive file. And the evidence, all the evidence I need on that is the debtors' own schedules and the evidence as presented in the response and—or not present in the response.

Tr., Aug. 8, 2001, at 3.

**6.** The court did make a finding regarding this vehicle: "That must be quite a Honda." Tr., Aug. 8, 2001, at 2.

## 2

The debtors contended it would be impossible to propose a confirmable chapter 13 plan, asserting that they would have only $35 of disposable income per month to fund a chapter 13 plan.[7] This sum would be insufficient for a confirmable chapter 13 plan because the $8,000 in priority tax debt must, as a matter of law, be paid in full during a life of the plan, which cannot exceed sixty months.

In other words, the debtors say they can fund a chapter 13 plan at $1,260 for thirty-six months and $2,100 for sixty months. I accept their $1,260 and read their schedules to say there is $41,499 (less the cost of one serviceable vehicle) of disposable income to fund a thirty-six month plan.

The extra $40,239 comes from refining the ore in the schedules.

First, one of the listed monthly expenses on Schedule J is $335 to pay the priority taxes that are listed on Schedule E. In order to avoid asymmetrical double counting, $335 per month must, as a matter of law, be added to the debtors' version of available disposable income.

Second, expiration of the BMW lease (at which point it is time to start driving the fully-owned pickup) adds another $535, effective in March 2002.

Third, expiration of the Honda lease adds another $654 (minus the expense of a substitute vehicle), effective in September 2002.

None of these adjustments entail disallowing an expense as not reasonably necessary for the debtors' support.

In other words, accepting the debtors' evidence and argument at face value, they have disposable income of $370 as of the date of filing bankruptcy on April 10, 2001, which would rise to $905 effective March 2002 and to $1,559 (less the cost of a replacement for the Honda) effective September 2002.

This disposable income would be sufficient to fund a $41,499 chapter 13 plan (less the expense of replacing the Honda) over 36 months. Thus, unsecured creditors would be looking at a dividend on the order of 25 percent if the court accepted all of the debtors' other expenses as reasonable.

This is ample ability to pay in order to justify a § 707(b) dismissal. *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 914 (9th Cir. 1988); *Gomes v. U.S. Trustee (In re Gomes)*, 220 B.R. 84, 87–88 (9th Cir. BAP 1998).

## 3

It is of no moment that this analysis entails speculation or that I am making a value judgment by not being offended at the concept of expecting a professional with a penchant for BMWs to stoop to driving the pick-up truck that his schedules indicate is worth $1,200, operable, and paid for once the BMW lease expires. That is the essence of what a trial court does when it goes about exercising § 707(b) discretion.

The court said it was relying on the schedules.[8] The fact that those schedules tend to support this speculation and value judgment, which leads to the same conclusion as the trial court reached, ought to be sufficient to preclude a finding of abuse of discretion.

7. They apparently concede a $196/month expense reduction.

8. The court said: "And the evidence, all the evidence I need on that [question of substantial abuse] is the debtors' own schedules and the evidence as presented in the response and—or not presented in the response." Tr., Aug. 8, 2001, at 3.

The majority's assertion that there needs to be more evidence about the pickup truck's condition exposes the flaw in its analysis: it is ignoring the abuse of discretion standard of review and is imposing de novo review by substituting its own judgment for that of the trial court.

When one merely parses the schedules, it is apparent that the debtors are hoist on their own petard.

### III

Since I submit that the evidentiary record is adequate to support a finding of ability to repay without resort to questions of reasonableness of expenses, I would not reach the issue of what record is necessary in order to support a finding of unreasonableness of expenses, even though the trial court made clear that it regarded some of the debtors' expenses as not reasonably necessary.

The question of whether it is appropriate for a trial judge merely to rely on the judge's experience, intuition, and knowledge of local conditions in determining unreasonableness of expenses without making specific findings is not essential to this decision and is better left to another day.

If we must reach reasonable necessity, then I would affirm on the basis that the court's comments on the record amount to rulings, which are not clearly erroneous, that various expenses, including transportation ($2,108), food ($800), telephone ($200), personal grooming ($100), are at a level that is not reasonably necessary for the support of two adults. Those findings are supported by the evidence of the schedules.

If the majority thinks a more precise determination of the reasonable necessity of particular expenses is essential to a finding of "substantial abuse" in this case and that the admittedly thin record is not adequate to the task of reviewing this question, then we should be remanding so that the trial judge can better explain himself regarding the reasonable necessity of the various expense items.

In short, the evidentiary record sufficiently supports the court's decision that I do not perceive an abuse of discretion. At worst, we should be remanding for better findings.

Accordingly, I dissent.