**In re Ted WOLCOTT, Debtor.**

**Donald TORGENRUD, Trustee, Plaintiff,**

v.

**Gail BENSON, Defendant.**

**Donald TORGENRUD, Trustee, Plaintiff,**

v.

**Ted WOLCOTT, Defendant.**

**Bankruptcy No. 94–31754–7.**
**Adv. Nos. 95/00029, 95/00030.**

United States Bankruptcy Court,
D. Montana.

April 5, 1996.

---

Robert G. Drummond, Chapter 13 Standing Trustee, Great Falls, Montana.

Bruce L. Hussey, Law Offices of Bruce L. Hussey, Missoula, Montana, for Debtor and Defendants.

## ORDER

JOHN L. PETERSON, Chief Judge.

In this Chapter 7 bankruptcy, Plaintiff Don Torgenrud, the Chapter 7 Panel Trustee filed on April 7, 1995, separate adversary proceedings against Debtor Ted Wolcott ("Wolcott"), and against Defendant Gail Benson ("Benson"). Adversary complaint 95/00030 against Wolcott seeks to deny Debtor's general discharge. Adversary complaint 95/00029 against Benson seeks to avoid preferential or fraudulent transfers of property and obtain turnover of bankruptcy estate property.

In the pleadings both Wolcott and Benson admit the Court has jurisdiction over the matters pursuant to 28 U.S.C. §§ 1334 and 157, and Benson admits that with regard to adversary complaint 95/00029, wherein the Trustee seeks to avoid transfer of property, the action is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F).

After due notice hearing was held on both matters at Missoula, March 7, 1996. The

Trustee appeared in person and by counsel as did Benson. Wolcott appeared through counsel, but, despite the Trustee's subpoena, did not appear in person. All the parties agreed that the evidence would apply to both adversary proceedings, notwithstanding an apparent variance of interests between the respective Defendants. Thus, the hearings were conducted by the Court simultaneously. The Trustee presented the testimony of Benson, Christopher Leary, Susan Bollinger and Lesa Matheny. Patricia Shiplet testified on behalf of Wolcott and Benson. Plaintiff/Trustee's Exhibits 1–8 and Defendants' Exhibits A–G were entered into evidence without objection.

Upon the closing of the evidentiary hearing, the Court granted the parties a period of ten days to submit memoranda in support of their respective positions together with proposed findings of fact and conclusions of law. Briefs having been filed, the matter is ripe for adjudication. Upon consideration of the record, the Court finds for the Trustee in each adversary proceeding.

The Trustee sets forth several contentions. First, regarding the complaint against Wolcott, the Trustee objects to Wolcott's general discharge under 11 U.S.C. § 727(a)(2), claiming that Wolcott transferred certain real and personal property to Benson with an intent to "hinder delay or defraud the Debtor's creditors," and that Wolcott filed false Schedules and Statement of Affairs. Regarding the complaint against Benson, the Trustee alleges the aforementioned transfers were made within 1 year of the filing of Wolcott's Chapter 7 petition, that Wolcott never received reasonably equivalent value in exchange for the transfers, that Benson had a close relationship with Wolcott indicating an intent to defraud in Wolcott's transfers to Benson, and that the transfers rendered Wolcott insolvent. Thus, the Trustee concludes, the improper transfers should be voided pursuant to 11 U.S.C. §§ 544 and 548, and the subject property should be turned over to the bankruptcy estate. In essence, the Trustee avers Wolcott filed for Chapter 7

in a calculated endeavor to use the bankruptcy statutes as a vehicle to defraud creditors, and that the transfers in question were a fundamental part of the scheme.[1]

Wolcott and Benson dispute this view. They urge that the Trustee has mis-characterized all of the relevant transactions, and deny that they harbored an intent to hinder, delay or defraud anyone. Benson and Wolcott further repudiate that they are or ever have been married as the Trustee has alleged, and consequently deny any close relationship between themselves. The two finally contend the transfers in question neither rendered Wolcott insolvent nor were made in bad faith.

### FINDINGS OF FACT

The Court finds certain background necessary to illustrate the context for the instant adversary proceedings. In connection with these two actions, the Trustee initially sent discovery requests to both Defendants in an effort to investigate and support the allegations in the adversary proceedings. Wolcott nevertheless refused to answer such requests, or to provide records of motor vehicle transfers, mobile home transfers and real property transfers, which the record now shows occurred less than a year prior to, and contemporaneously with the filing of the Wolcott bankruptcy.

In response to such refusals, the Trustee filed a Motion to Compel Answers to Discovery Requests on or about August 30, 1995. After the Court set the motion to compel for hearing, Wolcott filed a motion to convert from Chapter 7 to Chapter 13 on September 5, 1995, which the Court granted September 6, 1995. Following conversion, however, Wolcott moved to dismiss the bankruptcy case on November 22, 1995. Objections to the motion brought a ruling from the Court on December 6, 1995, denying the Debtor's motion under the best interests of the creditors test. The Court concluded "The Debtor is simply manipulating creditors' rights," and reconverted the case to one under Chapter 7.

---

1. The Trustee also alleges claims under 11 U.S.C. § 547 regarding preferences, but withdrew these in post-trial memoranda.

Turning now to the substance of the Trustee's complaints, the Court enters the following findings of fact.

## A.

The Trustee failed to establish Wolcott and Benson had a marital relationship. Benson admits the two filed real estate documents with Missoula County, referring to themselves as "husband and wife." But Benson claims they did so by mistake, and the evidence fails to refute that assertion. Moreover, this is the sole instance evidenced by the record in which they may have held themselves out as married people.

Nevertheless, Benson testified that both Benson and Wolcott executed durable powers of attorney in one another's favor. (See Exhibit A). Such powers of attorney are commonly exchanged between persons with close business relations and indicate the existence of close relationships of implicit trust and confidence. Benson also testified to the close friendship between the two, stating that the two had lived in the same house together, albeit as landlord and tenant, for many years. Moreover, when Benson changed residence, Wolcott followed, to take up lodgings with Benson once again as an ostensible tenant. Furthermore, Wolcott has aided Benson as a close confidant and advisor since the death of Benson's mother in 1988, when Benson allowed Wolcott to take control of Benson's important financial decision making. This arrangement continued until, according to Benson's own testimony, "almost to the present." Only post-petition has Benson become confident enough to again make serious financial judgments.

The Court finds from this evidence that although the two did hold themselves out once as husband and wife, Wolcott and Benson maintained for a period of about six years a relationship entailing at least as much confidence and trust with regard to financial affairs as that of a husband and wife. Indeed, when testifying about the nature of the transactions at bar, Benson unconsciously used the term "we" when referring to purchases and sales allegedly made by Benson alone. Later, when asked whether Wolcott had ever contributed money to any of the purchases, Benson answered in the affirmative, contrary to earlier contentions. On this reply, Benson's obviously surprised counsel asked for follow-up explanation. Apparently apprehending the misstep, Benson then attempted to explain away the inconsistent and clearly unexpected answer. Such obfuscation, however, carries little credence. Thus Benson's comportment on the stand strongly contradicted assertions that the two entered the transactions in question at bar solely with Benson's money or solely for Benson's benefit, and the Court finds them unworthy of belief. With regard to purchasing and selling real property, the evidence establishes Benson and Wolcott acted in concert to their mutual aid and benefit.

## B.

As to the circumstances of the challenged transfers, the Court finds Wolcott and Benson purchased real property located at 1909 35th Street, Missoula, Montana, by contract for deed on October 1, 1993. They also filed notice of purchasers' interest with the Clerk and Recorder of Missoula County, Montana. (Exhibit 1). The notice of purchasers' interest and the warranty deed associated with the transaction both described the purchasers and subsequent title holders as "Ted Wolcott and Gail Benson, husband and wife," and the warranty deed described them as "husband and wife, as joint tenants with the right of survivorship and not as tenants in common." (Exhibit 5).

On February 10, 1994, Wolcott and Benson filed of record in Missoula County a warranty deed granting Wolcott fee simple title in this property, recording the deed in Missoula County, Montana. (Exhibit 2). On August 11, 1994, Wolcott filed a quit claim deed, transferring all interest in the property to Benson. (Exhibit 6). Benson testified that the property at 1909 35th Street in Missoula was worth approximately $110,000.00. Approximately four months later, on December 9, 1994, Wolcott filed a bankruptcy petition.

Benson further testified that the transfers from Wolcott to Benson to Wolcott were done to receive certain trust indenture proceeds to pay off the underlying contract for deed. In fact, the record shows a deed of

trust was entered into between Wolcott and First Security Bank of Missoula, Montana, on the subject property, on February 8, 1994. (Exhibit 3). Moreover, a second trust indenture was entered into between Wolcott and First Security Bank on February 11, 1994. (Exhibit 4). Both deeds were recorded in Missoula County. The testimony of Sue Bollinger, Credit Manager at First Security Bank, in Missoula, Montana, corroborated the occurrence of these transactions. Thus, as of February 10, 1994, Wolcott held title to the property at 1909 35th Street in Missoula, Montana.

Lesa Matheny, an officer with Missoula Federal Credit Union under subpoena for the hearing, testified to certain checks drawn on Wolcott's account at the Credit Union. (See Exhibit 8). These checks disclose that Wolcott regularly made payments on the first deed of trust, which Sue Bollinger testified First Security Bank sold to Countrywide. The checks also show that Wolcott paid on the second deed of trust to First Security Bank. Wolcott continued to pay on the deeds of trust all the way through to November of 1994, ceasing just before filing bankruptcy. In sum, the checks establish that Wolcott, and not Benson, made the payments on the home at 1909 35th Street in Missoula, and that Wolcott continued to make those payments after he filed a quit claim deed in favor of Benson on the subject property.

Sue Bollinger also testified concerning a credit application Wolcott submitted for the loan on the subject real property. Wolcott listed income from Social Security retirement benefits, three rentals and one contract receivable for the sale of a mobile home. Wolcott claimed a net rental income as $1,080.00 and income from the contract receivable as $386.00 which, with Social Security benefits, totaled $1,912.00 per month.

Sue Bollinger also testified that First Security Bank had on file the three rental agreements which Wolcott referenced in his credit application with the Bank. Those rental agreements confirmed Wolcott's statements on the credit application, with respect to who was the landlord (Ted Wolcott) and the amount of the income stream as a result of the ownership of those rental properties.

Benson, however, testified that the three rental properties, which were all mobile homes, were all transferred into Benson's name in December of 1994, at about the same time that Wolcott filed for bankruptcy.

Lesa Matheny also testified concerning checks deposited in Wolcott's account at Missoula Federal Credit Union from records subpoenaed for hearing. Those checks establish that Wolcott received rent on the mobile home rental lots to Jeff Gordon, the Dwelling Place and Shelter West. Indeed, various checks contain notations indicating the makers issued the payments for "lot rent." This is consistent with the testimony by Sue Bollinger to the effect that Wolcott's credit application with First Security disclosed an account receivable on the sale of a mobile home.

Benson's testimony also substantiated Bollinger's account of the contents of Wolcott's credit application made for the first and second trust indentures on the property at 1909 35th Street in Missoula. Benson testified that an agreement for the sale and purchase of a 1970 Gallatin $14 \times 70$ mobile home was entered into between Wolcott as seller and "the Herbergers" as buyers, which netted a payment of $386.85 per month over the term of the contract. Benson also stated that Wolcott assigned the contract rights, which were in escrow at First Interstate Bank in Missoula, to Benson March 24, 1994, approximately 8½ months prior to filing the instant bankruptcy. Benson received payments by virtue of that assignment for the last 23 months, netting approximately $8,897.55.

Benson admitted that Wolcott transferred four mobile homes—a 1979 Peerless, a 1975 Magnolia, a 1983 Titan and a 1981 Governor—into Benson's name in December of 1994. Information supplied by Lesa Matheny, from the subpoenaed Missoula Federal Credit Union checks on Wolcott's account, also disclosed that payments were made on an Isuzu Trooper and Nissan Maxima automobiles. Further, Benson's testimony admitted that Wolcott transferred a 1993 Nissan truck, a 1989 Nissan Maxima and a 1978 Toyota all into Benson's name in December of 1994, at about the time of Wolcott's bankruptcy filing. No evidence was presented on

the value of these assets, due evidently to Wolcott's refusal to cooperate with discovery in this adversary proceeding and with the Trustee in the Chapter 7 bankruptcy.

Benson also frankly admitted in testimony that no value was ever given or received with regard to any of the transfers between Benson and Wolcott in question at bar, and this is fully consistent with the other exhibits and testimony offered at trial. No consideration whatsoever passed between Benson and Wolcott in exchange for the personal property transferred, or the real property transfers evidenced by the warranty deed of February 10, 1994, or the quit claim deed executed August 11, 1994. (Exhibits 2 and 6).

Furthermore, the last seven transfers, including four mobile homes and three automobiles, left Wolcott with tens of thousands of dollars more in debts than assets. The bankruptcy Schedules show that by the time these transfers were completed, Wolcott, who owed some $46,563.00 in credit card debts at the filing of this bankruptcy, had only $2,944.00 left in assets. Amazingly, to show solvency, Wolcott's counsel confesses in the post-trial memoranda to actually owning another piece of real property not disclosed in the original bankruptcy filings, and to surreptitiously selling the parcel during the pendency of this Chapter 7 case! This assertion is supported by no evidence, however, and while the Trustee, as a party-opponent can use unsubstantiated admissions against Wolcott, such assertions are of dubious admissibility and little weight when resorted to as evidence by their proponent. *See* Fed.R.Evid. 801(d)(2).

Finally, all of the transfers evidenced by the record, except for the warranty deed of October 1, 1993, in which Jack P. Stiffler and Maxine L. Stiffler granted title to Ted Wolcott and Gail Benson, occurred within one year of Wolcott's filing for Chapter 7 bankruptcy relief on December 9, 1994.

### C.

■ In adversary proceeding No. 95–00030 against Wolcott, the Court may properly consider Wolcott's Petition, Schedules and Statement of Affairs in the main case as evidentiary admissions made by Wolcott when offered by the Trustee, a party opponent. Fed.R.Evid. 801(d)(2); *see In re Cobb,* 56 B.R. 440, 442 (Bankr.N.D.Ill.1985). Furthermore, the Trustee also introduced these documents into evidence in the adversary proceeding against Benson without Benson's or Wolcott's objection. Fed.R.Evid. 103(a)(1). Thus the Court may consider Wolcott's bankruptcy Petition, Schedules and Statement of Affairs for the purposes of resolving both of the instant adversary proceedings. These documents contain the following declarations:

1. On Schedule A, "Real Property," Wolcott claims "NONE."

2. On Schedule B, "Personal Property,"

 Under item No. 15, "Accounts Receivable," Wolcott claims "NONE."

 Under item No. 18, "Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the Debtor other than that listed in the schedule of Real Property," Wolcott claims "NONE."

 Under item No. 23, "Automobiles, trucks, trailers, and other vehicles or accessories," Wolcott claims "NONE."

 Under item No. 33, "Other personal property of any kind not already listed," Wolcott claims only Social Security benefits in the amount of $434.00.

3. On Schedule D, Wolcott lists no creditors holding secured claims.

4. On Schedule F, Wolcott lists eleven debts for "credit card purchases" totalling $46,563.00.[2]

5. On Schedule I, Wolcott lists total monthly income as $434.00 from Social Security, and no other income of any kind, claiming "0.00" income from real property.

6. On the Statement of Financial Affairs,

 Under item No. 3., "Payments to Creditors," Wolcott claims "NONE."

---

2. The record shows in the year prior to filing bankruptcy Wolcott incurred credit card debts of $31,040.00, with the remaining claims in the amount of $15,523.00 listed as "credit card purchases" for 1993–94.

Under item No. 10, "Other Transfers," Wolcott claims "NONE."

Under item No. 17, "Books, records, and financial statements," at subparagraph (d), which requires a listing of all financial institutions, creditors and other parties to whom a financial statement was issued within two years immediately preceding the commencement of this case, Wolcott says "N/A."

7. Finally in the Statement of Financial Affairs, beneath the warning that the penalty for making a false statement or concealing property is a fine of up to $500,000.00 or imprisonment for up to five years or both, pursuant to 18 U.S.C. § 152 and § 3571, Wolcott's signature appears. Thus Wolcott attests under penalty of perjury to have read the foregoing Statement of Financial Affairs and that it is true and correct to the best of Wolcott's information and belief. The date of the signature is December 7, 1994.

Comparing the facts set forth in Parts A. and B., *supra*, with the foregoing statements from Wolcott's Schedules and Statement of Affairs, the Court finds at least six glaring and unambiguous falsehoods. For instance, in Schedule A, Wolcott lists no real property. Yet, as previously noted, in Wolcott's post-trial memoranda Wolcott expressly admits to have "failed to disclose" ownership of $45,000 worth of real property in Mineral County. Regardless of the truth of this assertion, such prevarications indicate an intent to deceive—Wolcott simply could not have been so wrong by accident.

On Schedule B, line item 18, Wolcott failed to list a durable power of attorney, executed pursuant to Mont.Code Ann. § 72–5–501 from Benson to Wolcott, (Exhibit A), which gives Wolcott comprehensive control over all of Benson's assets. Next, in Schedule D, Wolcott lists no creditors, notwithstanding conclusive testimony and documentary evidence showing Wolcott to be an obligor making payments on two trust indentures for the property at 1909 35th Street in Missoula. (Exhibits 3 and 4). Regarding Schedule I, bank records attested to by Sue Bollinger reveal Wolcott deposited significant rental income into Wolcott's accounts within a year prior to Wolcott's filing. Moreover, Sue Bollinger testified Wolcott claimed such income on a financial statement supplied to First Security Bank in connection with a loan disbursed to Wolcott in February 1994.

In addition, Wolcott's Statement of Financial Affairs fails to reveal payments, all clearly evidenced in the record, on the foregoing trust indentures and on other automobile loans. Another discrepancy involves line item No. 10, "Other Transfers," which asks for a list of any non-ordinary course of business transfers of property interests "either absolutely or as security within one year immediately preceding the commencement of this case." Wolcott claims "NONE." Yet abundant documentary evidence in the record clearly belies this bald avowal. For instance, Wolcott granted a deed of trust on February 8, 1994, and another on February 11, 1994. (Exhibits 3 and 4). Benson and Wolcott also executed a warranty deed to Benson on February 10, 1994, and Wolcott executed a quit claim deed to Benson on August 11, 1994. (Exhibits 2 and 6).

Finally, under No. 17, "Books, records, and financial statements," at subparagraph (d), which requires a listing of all financial institutions, creditors and other parties to whom a financial statement was issued within two years immediately preceding the commencement of this case, Wolcott says "N/A." Nevertheless, as described above, Sue Bollinger testified Wolcott gave a financial statement to First Security Bank in connection with the trust indentures of February 1994. In fact, Wolcott and Benson's own Exhibit F contains a financial statement signed by Wolcott on March 16, 1994.

Any of these mis-statements individually might establish little more than that Wolcott filled out the filing forms in a negligent or inattentive manner. The cumulative effect of the substantial discrepancies between Wolcott's Schedules and Statement of Financial Affairs and the evidence adduced at trial, however, especially combined in Wolcott's complete failure to cooperate with the Trustee of this bankruptcy, irrefutably imply corrupt motives. From the documentary evidence and from the testimony heard at trial,

the Court finds as a matter of fact Wolcott transferred property within one year of filing for bankruptcy in anticipation of such filing and with the specific intent to conceal assets from creditors and to either deprive creditors of, or to impede creditors in the recovery of, monies properly due them.

### CONCLUSIONS OF LAW

With regard to the burden of proof, the Trustee must sustain the essential allegations of the instant adversary proceedings by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991).

### A. Adversary Proceeding No. 95–00030.

Turning now to the complaint against Wolcott, in order for a court to deny a general discharge of debts under 11 U.S.C. § 727(a)(2)[3], the plaintiff must demonstrate the debtor's actual intent to conceal assets or to hinder, delay, or defraud creditors. Constructive fraudulent intent may not serve as the basis for denial of discharge, and courts must construe the statute "liberally in favor of debtors and strictly against the objector." *Devers v. Bank of Sheridan, Montana (In re Devers)*, 759 F.2d 751, 753–754 (9th Cir. 1985). In making this factual determination a trial court may make inferences regarding intent "from the circumstances surrounding the transaction." *Emmett Valley Associates v. Woodfield (In re Woodfield, In re Pearce)*, 978 F.2d 516, 518 (9th Cir.1992). The *Woodfield* court stated the test thus:

> Certain "badges of fraud" strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears. These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor

financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer. (Citations omitted.)

*Id.* Note that "close relationship" does not preclude relationships other than husband and wife, such as relationships of purely financial support or business advice. *See, e.g., Id.* at 518–519 (where the court found a corporation and a partnership contributing assets to it in a "close relationship"). A later decision supplemented this non-exclusive list with "retention by the debtor of the property involved in the putative transfer." *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805 (9th Cir.1994).

Applying the *Woodfield* test, the Court finds all six of the factors satisfied in the case at bar. (1) A close personal and financial relationship of trust and confidence existed between Benson and Wolcott. (2) The transfers were made in anticipation of filing of bankruptcy. (3) Wolcott, who was in the process of running up tens of thousands of dollars worth of credit card debt with insufficient income to support repayment, was in poor financial condition at the time of the transfers. (4) Wolcott transferred the substantial bulk of Wolcott's assets, including three automobiles and all but one parcel of real property. (5) The transfers, combined with Wolcott's absolute refusal to cooperate with the Trustee has significantly delayed creditors attempting to recover satisfaction of their debts. (6) The transfers from Wolcott to Benson and vice-versa were made in exchange for no consideration whatsoever.

Finally, the additional *Acequia* element exists here as well. Even after the transfer of

---

**3.** 11 U.S.C. § 727 provides:
(a) The court shall grant the debtor a discharge, unless—

\* \* \* \* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mu-

tilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
(A) property of the debtor, within one year before the date of the filing of the petition; or
(B) property of the estate, after the date of the filing of the petition.

the property in question, Wolcott remained in residence, with Benson and Wolcott carrying on in their living arrangements as they had prior to the transfer. This indicates that Wolcott continued to enjoy full possession of the property after the "putative transfer".

Benson did attempt to offer some vague and uncorroborated justifications for these actions. For instance, Benson said that owing to past credit problems Benson had experienced, the deed to the 1909 35th Street residence was taken out of Benson's name to secure a trust indenture on the property. When asked how the obligation had since been paid off, however, Benson could offer only an obscure and unpersuasive allusion to some inheritances Benson claimed to have since accrued. Moreover, Benson never supported these self-serving assertions with any documentary proof, and the Court finds them both lacking credibility and in conflict with the balance of the record. Thus, no "other convincing explanation appears" for the inculpating circumstances at bar.

The weight of evidence—such as the massive credit card charges shortly before filing, and Wolcott's clear deceit both before filing and at every stage of the case—clearly demonstrates that Wolcott planned to file bankruptcy when the challenged transfers were made, and that the transfers were part of an over-all scheme to defraud. Consequently, even when construing the statute "liberally in favor of the debtor," given the litany of perfidious behavior engaged in by Wolcott, the Court finds denial of discharge under 11 U.S.C. § 727(a)(2) not only fully supported by the Trustee's evidence, but clearly required.

As to the false declarations in Wolcott's Schedules and Statement of Affairs, the preparation and filing of such documents for the Bankruptcy Court "is no idle task." *Torgenrud v. Smith (In re Smith)*,

14 Mont.B.R. 228, 232 (Bankr.D.Mont.1995). Courts take a very dim view of the " 'intentional and fraudulent omission of property from sworn schedules [which] amounts to an offense punishable by the Criminal Code.' " *In re Woodson*, 839 F.2d 610, 614 (9th Cir. 1988). "Numerous cases hold that the debtor has a duty to prepare schedules carefully, completely and accurately." *In re Mohring*, 142 B.R. 389, 394 (Bankr.E.D.Cal.1992), *aff'd mem.*, 153 B.R. 601 (9th Cir. BAP 1993), *aff'd mem.*, 24 F.3d 247 (9th Cir.1994). Moreover, a debtor must correct such documents filed with a court upon learning of their inaccuracy or incompleteness. *Id.* The debtor has "no discretion in this regard." *Smith*, 14 Mont.B.R. at 233. Furthermore, a debtor has an affirmative duty to "cooperate with the trustee in preparing a 'complete inventory of the property of the debtor.' " *Mohring*, 142 B.R. at 394. Failure to follow these precepts results in denial of a debtor's general discharge for harboring an intent to conceal property. 11 U.S.C. § 727(a)(2); *Devers*, 759 F.2d at 753–754.

In the case *sub judice*, Wolcott's actions fly in the face of the foregoing dictates. The Court identified at least six flat falsehoods contained in Wolcott's Schedules and Statements of Affairs. Furthermore, in written arguments filed with the Court, Wolcott boldly admitted to concealing from the Trustee a $45,000 asset. These flagrant violations of Wolcott's clear duty of honesty and forthrightness in the conduct of Wolcott's bankruptcy clearly demonstrate a calculated intent to conceal property. Thus, once again, even construing the evidence against Wolcott in the most lenient light, the Court finds 11 U.S.C. § 727(a)(2) altogether satisfied.

**B. Adversary Proceeding No. 95/00029**

Turning to the adversary complaint against Benson, in construing 11 U.S.C. § 548(a)(1),[4] this Court has held:

---

4. 11 U.S.C. § 548 provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or

defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was

In order to void transfers as being fraudulent, it is only necessary to find *either* there was no consideration given and the Debtor was thereby rendered insolvent, *or* that there was actual intent to hinder, delay or defraud creditors. (Emphasis in original.)

*Bartlett v. Allen (In re Allen)*, 6 Mont.B.R. 77, 86 (Bankr.D.Mont.1988) (citing *In the Matter of Christian and Porter Alum. Co.*, 584 F.2d 326 (9th Cir.1978)). This case satisfies both criteria. With regard to the first, the Court found Wolcott executed the transfers complained of for no consideration. Moreover, the Bankruptcy Code defines insolvency as a "financial condition such that the sum of [an] entity's debts is greater that all of [an] entity's property." 11 U.S.C. § 101(32). In other words, " 'a debtor is insolvent when its liabilities exceed its assets.' " *Francis v. Gramm (In re Fleming)*, 8 Mont.B.R. 478, 483 (Bankr.D.Mont.1990) (quoting *In re Sierra Steel, Inc.*, 96 B.R. 275, 277 (9th Cir. BAP (1989)). Upon the last seven transfers to Benson by Wolcott of the mobile homes and automobiles, Wolcott's liabilities exceeded Wolcott's assets by some $41,000. Thus the transfers rendered Wolcott insolvent.

 The facts fit the second criteria even more closely. In all of the transactions in question, Wolcott was the last transferor, quit claiming the 1909 35th Street residence to Benson in August of 1994, and transferring the mobile homes and automobiles to Benson in December of 1994. Although the statute does not express whether the transferee must have culpable intent in order to require turnover of property, at least one court has held "for the purposes of 11 U.S.C. § 548(a)(1), plaintiff must show fraudulent intent on the part of the transferor, rather than on the part of the transferee." *Rubin Bros. Footwear, Inc. v. Chemical Bank (In re Rubin Bros. Footwear, Inc.)*, 119 B.R. 416, 423 (S.D.N.Y.1990). The Court adopts the reasoning of this persuasive authority. As previously determined, Wolcott, the transferor, actually intended the transfers to hinder,

incurred, or became insolvent as a result of such transfer or obligation;

delay or defraud creditors. Thus 11 U.S.C. § 548(a)(1) is clearly fulfilled.

The Court must therefore void the transfers of real and personal property executed by Wolcott in the year prior to Wolcott's filing for bankruptcy to Benson, an insider, including:

1. The quit claim deed to Benson executed August 11, 1994, on real property located at 1909 35th Street in Missoula evidenced by Exhibit 6 and valued by Benson at approximately $110,000.00;

2. The assignment to Benson March 24, 1994, of contractual rights in escrow with First Interstate Bank of Missoula on the sale of a 1970 Gallatin 141 × 701 mobile home in amount of $386.85 per month testified to by Benson;

3. The transfer of title to Benson in December of 1994 of a 1979 Peerless, a 1975 Magnolia, a 1983 Titan and a 1981 Governor testified to by Benson;

4. The transfer to Benson of a 1993 Nissan truck, a 1989 Nissan Maxima and a 1978 Toyota testified to by Benson.

As a further consequence, Benson must turnover to the bankruptcy estate these assets, plus proceeds in the amount of $8,895 Benson received on the mobile home contract.

Having so determined, the Court need not consider the merits of the Trustee's allegations made pursuant to 11 U.S.C. § 544 and Montana Uniform Fraudulent Transfers Act.

### CONCLUSION

With regard to adversary proceeding 95/00030 against Defendant Ted Wolcott, the Court finds Wolcott transferred substantial assets within one year in anticipation of filing for bankruptcy in an effort to hinder, delay or defraud creditors, and filed false bankruptcy schedules, so that pursuant to 11 U.S.C. § 727(a)(2), the Court must deny Wolcott's discharge. With regard to adversary proceeding 95/00029 against Defendant Gail Benson, the Court finds that the transfers complained of rendered Wolcott insolvent and were made for no consideration, and the

488

Court also finds Wolcott made the transfers with actual intent to hinder delay or defraud creditors, and therefore, pursuant to 11 U.S.C. § 548(a), the Court must void the transfers and order the property transferred turned over to the bankruptcy estate.

IT IS ORDERED in adversary proceeding 95/00030 against Ted Wolcott, Plaintiff Don Torgenrud's objection to discharge based on 11 U.S.C. § 727(a)(2) is sustained and the Clerk shall enter Judgment denying Debtor Ted Wolcott a general discharge of debts in bankruptcy.

IT IS FURTHER ORDERED the Clerk shall enter Judgment for Plaintiff/Trustee Don Torgenrud on the complaint to avoid fraudulent transfer in adversary proceeding 95/00029, and against Gail Benson, declaring the following transfers of property void:

1. The quit claim deed to Benson executed August 11, 1994, on real property located at 1909 35th Street in Missoula, Montana;

2. The assignment to Benson March 24, 1994, of contractual rights in escrow with First Interstate Bank of Missoula on the sale of a 1970 Gallatin 141 × 701 mobile home in amount of $386.85 per month;

3. The transfer of title to Benson in December of 1994 of a 1979 Peerless, a 1975 Magnolia, a 1983 Titan and a 1981 Governor;

4. The transfer to Benson of a 1993 Nissan truck, a 1989 Nissan Maxima and a 1978 Toyota.

IT IS FURTHER ORDERED Defendant Gail Benson shall immediately surrender and turnover the foregoing property, together with $8,895 in proceeds from the sale of the Gallatin mobile home, to the Plaintiff Trustee of the bankruptcy estate.