**In re John L. Matthew LENARTZ and Tamera Jean Lenartz, Debtors.**

**No. 01–40268.**

United States Bankruptcy Court, D. Idaho.

June 12, 2001.

Fred J. Lewis, Racine Olson Nye Budge
& Bailey, Pocatello, Idaho, for Debtors.

Stephen J. Blaser, Blaser Sorensen & Hansen, Blackfoot, Idaho, for Creditor Central Garden & Pet Supply.

Jeff Howe, Office of the U.S. Trustee, Boise, Idaho.

L.D. Fitzgerald, Pocatello, Idaho, Chapter 7 Trustee.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

### I. Background

The critical issues raised in this case concern whether Chapter 7 Debtors John L. and Tamera Jean Lenartz ("Debtors") have adequate means with which to pay a significant portion of their debts, or have been guilty of "bad faith" in seeking Chapter 7 bankruptcy relief. On April 25, 2001, Creditor Central Garden and Pet Supply ("Creditor") moved to convert Debtors' Chapter 7 case to one under Chapter 11, pursuant to Section 706(b) of the Bankruptcy Code (Docket No. 7, as orally modified on April 25, 2001). In addition, on April 25, 2001, the Court issued an order on its own motion requiring Debtors to show cause why their petition should not be dismissed under Section 707(b) for "substantial abuse" of the provisions of Chapter 7. (Docket No. 17). A consolidated hearing on the motion and the order to show cause was conducted on May 14, 2001, at which the parties and the Chapter 7 trustee appeared, and testimony and evidence were presented. Thereafter, the Court took the issues under advisement. This Memorandum constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr.P. 7052; 9014.

### II. Facts

According to their schedules, Debtors have a combined gross income of over $107,000 per year, or nearly $9,000 per month. Mrs. Lenartz has one five-year-old son for whose benefit she receives an additional $400 per month in child support. Debtors indicate they spend approximately $6,500 per month on living and other expenses. Included in Debtors' monthly budget are expense items such as $725.00 for food; $142 for an installment loan on a piano; $50 for an installment loan on a lawn tractor and exercise equipment; $509.93 for back taxes owed to the federal government and $200 for back taxes owed to the State of Utah; and, most notably, $1,435.27 for payments on Mrs. Lenartz' student loans, which total $115,437.49. Debtors' Exhibit 2; Amended Schedule F.

Debtors have scheduled $916,662.57 in secured claims (Amended Schedule D), $24,552.59 in priority unsecured claims (Schedule E), and $214,039.67 in non-priority unsecured claims (Amended Schedule F).

Debtors currently own an interest in six different homes, some of which are currently occupied by tenants. Originally, Debtors' schedules reflected their intention to retain their residence in Rigby, Idaho, and another property in West Jordan, Utah, while surrendering the remaining properties. Debtors subsequently amended their schedules, and have now indicated an intention to surrender all the properties other than their residence.

While Debtors live just outside Rigby, Idaho, they are both employed by the Idaho National Engineering and Environmental Laboratory ("INEEL") located near Arco. Mr. Lenartz is employed as a radiological control technologist, and Mrs. Lenartz holds an entry-level supervisory position. To arrive at work by 8:00 a.m., Mr. Lenartz rides a bus which leaves Rigby at 5:00 a.m. Mrs. Lenartz drives first to Idaho Falls to drop off her child at daycare, then another 52 miles to the INEEL site. Mrs. Lenartz testified she drives approximately 3,500 to 4,000 miles per

month in her commute. Both Debtors work four ten-hour shifts per week.

At hearing, Mrs. Lenartz testified that their bankruptcy filing was precipitated by several events occurring over a relatively short period of time. For instance, several of their rental properties became vacant, although even when occupied, the rent was not sufficient to pay the mortgages on the properties. Creditor also sued Debtors in state court, and on April 6, 2000, obtained a judgment against them for $3,213.92, and was pursuing collection. Debtors also had a horse trailer, Ford F–350 truck, and some fencing repossessed. In addition, Mrs. Lenartz fears INEEL will be eliminating supervisory positions like hers in the next six months to one year, and produced a letter from the "Restructuring Opportunities Team" at INEEL reflecting that possibility. Debtors' Exhibit 1.

Creditor complains that Debtors should not be allowed to remain in Chapter 7, citing Debtors' high income and unreasonable budget items, requesting instead that their Chapter 7 case be converted to one under Chapter 11. 11 U.S.C. § 706(b). Additionally, based upon an initial review of their schedules, the Court had concerns with Debtors remaining in Chapter 7. 11 U.S.C. § 707(b). Debtors insist their request for Chapter 7 relief is proper. The issues are discussed below.

## III. Discussion

### A. Conversion to Chapter 11 Pursuant to Section 706(b)

Creditor has requested that Debtors' Chapter 7 case be converted to one under Chapter 11 pursuant to Section 706(b), which provides that "[o]n request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time." 11 U.S.C. § 706(b). In a prior decision entered May 3, 2001 (Docket No. 22), the Court ruled, as a threshold matter, that Creditor indeed has standing to request the involuntary conversion of this case to Chapter 11, even though Debtors are individuals. Hearing on Creditor's motion was continued to receive evidence and to consider argument on the merits to determine whether, in the Court's discretion, conversion to Chapter 11 was appropriate on the facts of this case. The Court concludes conversion to Chapter 11 is unwise under these circumstances.

In this case, Debtors have no business to reorganize. They each work for salary based upon their personal services. Debtors' post-bankruptcy earnings are therefore not property of the bankruptcy estate. 11 U.S.C. § 541(a)(6). Therefore, while a Chapter 11 debtor may choose to voluntarily commit his or her post-petition income to fund payment to creditors under a reorganization plan, individual debtors cannot be compelled to finance a plan with their wages and salaries. Of course, in Chapter 11, Debtors' creditors or a court-appointed trustee could propose a plan for payment of creditors. 11 U.S.C. § 1121(c). Realistically, though, absent Debtors' cooperation, it would be impractical, if not plainly infeasible, to attempt to force Debtors to pay their debts through Chapter 11 if they were not inclined to do so. *See* 11 U.S.C. § 1129(b)(12). On the facts of this case, then, Chapter 11 does not appear to be a meaningful alternative to Chapter 7, as neither Debtors nor their creditors would likely benefit from conversion. Creditor's motion to convert will be denied.

### B. The Court's Order to Show Cause Regarding Section 707(b) Dismissal for Substantial Abuse

On April 25, 2001, the Court issued its order requiring Debtors to show cause

why their petition should not be dismissed pursuant to Section 707(b) for "substantial abuse." (Docket No. 17). Section 707(b) provides:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b). Debtors are individuals and in this case concede their debts are "primarily consumer debts." Therefore, the first two elements of Section 707(b) are met.

 "Substantial abuse" is not defined in the Bankruptcy Code. In the Ninth Circuit, the primary factor the Court must consider in the substantial abuse analysis is whether a debtor can pay his or her debts.

> [t]he debtor's ability to pay his debts when due, as determined by his ability to fund a chapter 13 plan, is the primary factor to be considered in determining whether granting relief would be a substantial abuse .... This is not to say that inability to pay will shield a debtor from section 707(b) dismissal where bad faith is otherwise shown. But a finding that a debtor is able to pay his debts, standing alone, supports a conclusion of substantial abuse.

*In re Kelly,* 841 F.2d 908, 914–15 (9th Cir.1988). After analyzing the Debtors'

schedules, and hearing testimony from Mrs. Lenartz, it is clear to the Court that Debtors have the ability to pay a significant amount to their unsecured creditors. In addition, other factors exist in this case which indicate that if allowed to continue, a substantial abuse of the provisions of Chapter 7 will result.

### 1. Debtors' Ability to Repay Their Debts

To demonstrate what their creditors might expect to receive were they to file for Chapter 13 relief, at hearing Debtors presented exhibits detailing two hypothetical Chapter 13 scenarios. "Scenario 1" (Debtors' Exhibit 2) includes a payment of $150 per month to acquire an older, reliable second car, because Debtors intend to surrender their 1999 Ford Expedition, and their 1996 Ford F–350 was repossessed. "Scenario 2" (Debtors' Exhibit 4) eliminates the payment and insurance for the second car. Under both scenarios, Debtors assume they would propose a five-year Chapter 13 plan. For purposes of this decision, the Court will address the first scenario, because in the Debtors' situation, with work and daycare long distances away from their home, a second car seems necessary.

In Scenario 1, Debtors insist the most they could pay to unsecured creditors is $106.13 per month, or $6,501.28 over five years, representing a payout to creditors of only 2.99%.[1] However, in arriving at their "bottom line," the Court concludes that several expense items in Debtors' budget are unreasonable or excessive, requiring adjustment.[2]

---

**1.** The amount of debt is based upon Debtors' schedules, not filed, allowed proofs of claim. The payout to individual creditors would, of course, be proportionately higher if all creditors did not timely file allowable claims.

**2.** Debtors did not address their eligibility for Chapter 13 relief. Instead, the parties and Court have assumed Chapter 13 for purposes of reviewing their "scenarios." However, Debtors have scheduled $916,662.57 in non-

### a. Student Loan Payments

Mrs. Lenartz has undergraduate degrees in aerospace engineering and physics, and graduate degrees in physics and business administration. Along the way to acquiring these degrees, she accrued $115,437.49 in student loans (Amended Schedule F). While Mrs. Lenartz was enrolled in even more college classes during fall and spring of 2000, she testified that completion of these current classes will not enable her to obtain further degrees, nor will it improve her employment opportunities. In fact, Mrs. Lenartz indicates she is "overqualified" for her job as an entry-level supervisor at INEEL. Instead, to the Court's chagrin, Mrs. Lenartz candidly admitted at hearing that she enrolled in these classes for the sole purpose of deferring her obligation to begin payments on her student loans. Were this approach to financial planning not offensive enough, Mrs. Lenartz also testified that she borrowed about $9,000 to pay for these additional college courses!

Try as she might to avoid it, Mrs. Lenartz indicated her deferral period has now ended, and her student loan payments will be coming due starting in June 2001, at $1,435.27 per month payable over the next ten years. Scenario 1 assumes she will make payments directly to the lenders each month in this amount. At this point, she has not attempted to negotiate with the student loan lender any sort of graduated or extended payments, or to restructure those loan payments in any fashion. Based upon the Court's calculations, if Mrs. Lenartz were to extend her student loan repayment over thirty years, at an average interest rate of eight percent, terms which, based upon the Court's experience, are frequently offered to borrowers, her monthly payments could be reduced to approximately $850, or nearly $600 less than the current payment. Were it to allow her to fund a Chapter 13 plan and pay more to her other creditors, it does not seem too much to ask that Mrs. Lenartz at least explore this option.

More importantly, however, because the student loans are nonpriority unsecured debts, it is likely inappropriate that they be considered a monthly expense item in a Chapter 13 analysis. Rather, the student loan creditors would be paid in some fashion by the trustee through a Chapter 13 plan from Debtors' disposable income. While any balance due on the student loans at the conclusion of the plan would likely be excepted from discharge, Debtors could have access to $1,435 per month more, or $86,100 over five years, to pay unsecured creditors collectively.

### b. Food Budget

■ Debtors' food budget is also a concern to the Court. Debtors indicate they spend $725 per month for food for themselves and Mrs. Lenartz's son. This amount is substantial based in no small part on Debtors' practice, during their four-day work week, of almost exclusively "eating out." The child is given "fast food" for breakfast and dinner, and Debtors pay for his lunches and afternoon snacks at his preschool. For themselves, Debtors purchase breakfast and lunch at their cafeteria at work, and fast food for dinner on the way home. This approach to dining comes at a cost of $33.50 per day during the work week for Debtors' food. By comparison, Debtors need spend only $10 per day for food when not working.

contingent, liquidated, secured debts (Amended Schedule D), which exceeds the Chapter 13 debt limits found in 11 U.S.C. § 109(e).

That Debtors may not be eligible for Chapter 13 relief is a factor addressed later in this opinion.

The Court appreciates that Debtors work long days and have a long commute each day. However, such a heavy reliance upon restaurants for their meals hardly suggests a willingness to consider the interests of their creditors in this case. For a family of two adults and one small child, $33.50 per day for food seems indulgent. Even recognizing the demands of Debtors' employment, the notion of packing a breakfast or lunch from home each day, and having dinner at home each night seems warranted. Allocating $500 per month for food, or $17 per day for food, which is more than Debtors concede they spend when eating at home, seems more reasonable. This reduction in their food expense would increase their disposable income by $225 per month, or $13,500 over a five year plan.

### c. Luxury Items

■ Debtors have also listed installment payments as monthly expenses for what the Court would characterize as purely nonessential goods, such as a piano, lawn tractor, and weight-lifting equipment. These goods, in good conscience, could be sold or surrendered to the secured creditors. Eliminating these expenses would free up $192 per month, or approximately $11,500 for unsecured creditors over a five-year plan.

### d. Total Payout to Creditors

In sum, if Debtors were to eliminate the installment loans for the piano, lawn tractor, and weight equipment, reduce their food budget to $500 per month, and eliminate Mrs. Lenartz's student loan payment as a budget expense, they would conceivably have $1,958 per month in disposable

income available to pay to their unsecured creditors.

■ The majority of cases following *Kelly* have relied upon the percentage of debt which could be paid in conducting the substantial abuse analysis. However, neither the Bankruptcy Code nor *Kelly* set forth any bright-line percentage test to determine the existence of substantial abuse. *Kelly*, 841 F.2d at 914; *Gomes v. U.S. Trustee (In re Gomes)*, 220 B.R. 84, 88 (9th Cir. BAP 1998). There is a good reason no mechanical formula is used, since any threshold percentage would be subject to manipulation by a debtor intent on abusing Chapter 7 through the accumulation of more debt. *See, e.g., In re Reese*, 236 B.R. 371, 375, n. 5 (Bankr.N.D.Ohio 1999). Instead, whether a debtor's disposable income is sufficient to fund a repayment plan should be decided on the facts of each case. Here, the Court concludes Debtors surely have sufficient funds available to try to pay a portion of their debts.

Debtors have scheduled $214,039.67 in unsecured debt (Amended Schedule F). As the Court noted above, Debtors may have as much as $1,958 per month, or $70,488 over three years, or $117,480 over five years, to pay unsecured creditors. This translates to payment of approximately 33% of their scheduled unsecured debts over three years, or 55% over five years. These amounts are significant. With reasonable adjustments, Debtors have the ability to repay what this Court would characterize as a "substantial" portion of their debts, whether it be over three or five years.[3] In the Court's opinion, Debtors' use of Chapter 7 under these circumstances amounts to substantial abuse.

---

3. In *Gomes,* the Panel found that repayment of 43% of debtors' debts over three years based upon disposable income of $1,287 per month was "no small sum" and therefore dismissed debtors' petition for substantial abuse. *Gomes,* 220 B.R. at 88. Notably, there were no additional bad faith factors present in *Gomes. Id.*

## 2. Bad Faith

The Court's analysis does not end with the above conclusion, though. In *Kelly,* the Ninth Circuit left open the possibility that even without the ability to repay debts, a debtor might not be shielded from dismissal for substantial abuse if evidence of bad faith is present. *Kelly,* 841 F.2d at 915. The Court also recently suggested Section 707(b) should be viewed by bankruptcy courts as a tool to deal with unscrupulous and non-needy debtors. *In re Padilla,* 222 F.3d 1184, 1194 (9th Cir.2000), quoting *In re Motaharnia,* 215 B.R. 63, 69 (Bankr.C.D.Cal.1997). After reviewing Debtors' schedules and hearing testimony from Mrs. Lenartz, the Court has identified significant evidence of Debtors' bad faith in this case so as to warrant dismissal for substantial abuse.

### a. Student Loans

As noted above, the Court was disappointed to hear Mrs. Lenartz's unabashed admission that she remained in college solely to postpone any obligation to begin payment of her outstanding student loans, even though she is not currently seeking any further degrees, and is already over-qualified for her position at INEEL. She also conceded that she borrowed $9,000 for the fall and spring semesters of 2000, and she explained that in addition to paying for tuition, Debtors used a portion of the borrowed funds to pay other bills, such as the mortgages on their various rental properties. To the Court, this behavior borders on scandalous. Debtors' abuse of the student loan system is one factor indicative of bad faith.

### b. Debtors' Latest Debts

In the year and a half prior to filing for bankruptcy, Debtors racked up an additional $280,000 in secured debt. They took out first and second mortgages on their house in Menan, totaling $197,695.39. They financed the purchases of a 1999 Ford Expedition for $32,000; a camp trailer for $21,000; and various consumer goods such as binoculars, outdoor grill, movie camera, TV, VCR, video camera, Playstation and games, computer, and tools for $10,065. And, just four days prior to filing for bankruptcy relief, Debtors purchased their a 1996 Jeep Cherokee, financing $13,300 of the $19,300 purchase price. In addition, Debtors had purchased their current home in Rigby, valued at $160,000, just six months prior to bankruptcy. During this same period of time, Debtors incurred over $8,000 worth of debt on two unsecured lines of credit, ran up over $7,000 in credit card transactions, and Mrs. Lenartz borrowed an additional $9,000 in student loans (Amended Schedule F).

In incurring the debt, Debtors could not have reasonably believed all was well for them financially, either. Debtors' truck and horse trailer had been repossessed, fencing material was removed by the vendor from their property for failure to pay, and a foreclosure had occurred in 1998 concerning their home in Salt Lake City leaving them owing a deficiency of over $5,000 (Amended Schedule F). In other words, the Court can only believe that Debtors incurred debt and acquired assets on credit at a rapid pace, without any reasonable expectation they could repay the debt during a time of obvious financial difficulty. To the Court, this demonstrates a disregard for the interests of their creditors, both existing and new, and is further evidence of Debtors' bad faith.

### c. Transfers of Property

On their schedules, Debtors indicate that within six months of filing for bankruptcy, they sold various assets to family members, for which they received $36,000

(Amended Statement of Financial Affairs). Debtors used the $36,000 toward a down payment on their home in Rigby, which is worth $160,000 according to their schedules, and for which they now owe $112,000. They have claimed the equity in this home exempt. (Schedule C). Mrs. Lenartz testified that prior to the time of this purchase, they were living in their home in Menan, worth $169,000, but encumbered by first and second mortgages securing about $200,000 in debt.

According to Mrs. Lenartz, Debtors' intent during this time was supposedly to purchase a home with a smaller mortgage, thereby freeing up funds to pay other creditors. However, Debtors still own the home in Menan, and it is unclear how creditors will receive the benefit of this purported "downsizing." Instead, Debtors' secured debt was once again increased, exempt equity created in the home, and arguably disqualifying Debtors from eligibility for Chapter 13 relief.

### d. Purchases Made with Tax Refund

Mrs. Lenartz acknowledged at the hearing that Debtors had received and spent approximately $12,000 from their year 2000 tax refund within one month prior to the filing of their bankruptcy petition. This money was spent exclusively on assets which Debtors now claim exempt, and after speaking to their bankruptcy attorney. Debtors used $1,000 for new bedroom furniture for Mrs. Lenartz's son, $700 for a new computer, and $1,950 for a new sofa and love seat. Just four days before filing their bankruptcy petition, Debtors purchased a 1996 Jeep Cherokee for $19,300, using $6,000 of their tax refund for a down payment, and an additional $1,000 to pay sales tax on the vehicle. None of the money was used to pay creditors.

Mrs. Lenartz testified that, by this time, the amount of their debt was so overwhelming, Debtors felt it would be "pointless" to attempt to pay creditors, understanding that any payments made to creditors within a short time before filing for bankruptcy protection might be considered preferential and subject to avoidance by the trustee. What Mrs. Lenartz did not explain is why the tax refund was not simply retained and turned over to the trustee for distribution to the creditors, rather than spent just one month prior to filing their petition for bankruptcy relief. Her explanation is less than satisfying.

Generally, a debtor's conversion of nonexempt property to exempt property, even on the eve of bankruptcy, is not fraudulent per se. *Coughlin v. Cataldo (In re Cataldo)*, 224 B.R. 426, 429 (9th Cir. BAP 1998) (citing *In re Jackson*, 472 F.2d 589, 590 (9th Cir.1973)). However, Debtors' expenditure of a $12,000 non-exempt tax refund within one month of filing for bankruptcy relief, in the face of well over $200,000 in unsecured debt, may certainly contribute to an overall finding of bad faith, especially when viewed in connection with the other actions taken by Debtors prior to bankruptcy.

### e. Mitigating Factors

There are facts which suggest that Debtors may have difficulty in proposing a workable debt repayment plan. For example, Mrs. Lenartz is legitimately worried that her position at INEEL will be eliminated in six months to a year. Indeed, that is the import of the letter from the "Restructuring Opportunities Team" at the INEEL (Exhibit 1). Mrs. Lenartz indicated that while rumors of layoffs are "always floating around," her concerns became more concrete in January and especially after the letter was circulated in May.

It is not absolutely clear that Mrs. Lenartz's employment will be interrupted, though. The letter suggests layoffs will only occur if an insufficient number of employees take advantage of an early retirement or voluntary reduction plan. Furthermore, the letter does not specify which supervisors or managers would be eliminated or what departments will be targeted. Therefore, it is difficult for the Court to assume as fact that Mrs. Lenartz will lose her job within one year for purposes of this Section 707(b) analysis. *See, Gomes,* 220 B.R. at 88, n. 7 ("The alleged possibility of a pay reduction is hardly determinative for excusing the [debtors] from a finding of substantial abuse.") Moreover, Mrs. Lenartz is a well-educated, articulate person with an abundance of marketable skills. The Court is comfortable in presuming that even if she is laid off at INEEL, she will locate other employment, even if not at the same pay.

### 3. Eligibility for Chapter 13 Relief

██ Another factor should be mentioned in Debtors' favor. While two of Debtors' "scenarios" reflected a proposed budget under a hypothetical Chapter 13 case (Exhibits 2–4), Debtors may currently be ineligible for Chapter 13 relief under the statutory debt limits. 11 U.S.C. § 109(e). While the Ninth Circuit test considers the ability to repay creditors in the context of funding a hypothetical Chapter 13 plan, *see Kelly,* 841 F.2d at 914, it has not specifically addressed whether the availability of Chapter 13 should be a requirement for Section 707(b) dismissal. Judge Hagan has previously opined that even if a debtor has the ability to repay a significant portion of his debt, if that debtor is ineligible for Chapter 13 relief and Chapter 11 would not be a meaningful alternative, then dismissal under Section 707(b) is inappropriate. *In re Williams,* 93 I.B.C.R. 176, 177, 155 B.R.

773, 774–75 (Bankr.D.Idaho 1993) citing *In re Mastroeni,* 56 B.R. 456, 459 (Bankr. S.D.N.Y.1985).

This is one of those rare occasions on which this bankruptcy judge must respectfully disagree with a decision of his distinguished former colleague in light of the facts of this case. There is no express language in Section 707(b) indicating that Chapter 13 eligibility is a condition for dismissal for substantial abuse. While *Kelly* analyzed the facts with reference to that debtor's ability to fund a Chapter 13 plan, it did not specifically address the situation where a debtor has substantial disposable income, but was ineligible for Chapter 13. That significant difference in the facts, in this Court's opinion, distinguishes this case from *Kelly* or *Williams.* In addition, and unlike in those cases, here Debtors have also engaged in aggravating activities not present in *Williams.*

Instead, the Court agrees with the Sixth Circuit and other bankruptcy courts which have concluded that eligibility for Chapter 13 relief is not a prerequisite for Section 707(b) dismissal.

> The anomalous result of saying those whose high unsecured indebtedness renders them ineligible for Chapter 13 treatment can always avoid § 707(b) dismissal, would be rewarding outrageous abusers of consumer credit, while denying to those with more moderate consumer debt the benefits of Chapter 7. Indeed, such a bright-line test could be said to encourage debtors to run up unsecured debts in excess of [the eligibility limits], thereby avoiding dedication of future earnings to debt retirement under Chapter 13.

*In re Krohn,* 886 F.2d 123, 126 (6th Cir. 1989).

██ "There is no constitutional right to a bankruptcy discharge, and the 'fresh

start' provided for by the Code is a creature of congressional policy." *Id.* citing *U.S. v. Kras,* 409 U.S. 434, 446–47, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). *See also Scheinberg v. U.S. Trustee (In re Scheinberg),* 134 B.R. 426, 430–31 (D.Kan.1992) (agreeing with *Krohn* that eligibility for Chapter 13 was not a prerequisite to a Section 707(b) dismissal); *In re Makinen,* 239 B.R. 532, 536, n. 1 (Bankr.D.Minn. 1999) (eligibility for Chapter 13 relief is not relevant to the Section 707(b) analysis); *In re Uddin,* 196 B.R. 19, 24 (Bankr. S.D.N.Y.1996) (rejecting debtor's argument that the case should not be dismissed for substantial abuse because he was unemployed and was therefore ineligible for Chapter 13 relief, because he had engaged in extravagant purchases which he knew he could not repay); and *In re Nolan,* 140 B.R. 797, 802 (Bankr.D.Colo.1992) (finding that even though debtor was ineligible for Chapter 13 relief, other factors overrode the statutory presumption for the granting of Chapter 7 relief).

█ Given Debtors' financial situation and the offensive manner in which they have incurred much of their debt, allowing Debtors to escape dismissal under Section 707(b) for substantial abuse is a result this Court cannot accept. That Debtors do not currently qualify for Chapter 13 relief not a sufficient reason to avoid the conclusion that Debtors' petition must be dismissed for substantial abuse of the provisions of Chapter 7. 11 U.S.C. § 707(b). And, while they cannot be compelled to do so, if Debtors genuinely desire bankruptcy relief, they could explore a voluntary conversion and offering a repayment plan under Chapter 11. 11 U.S.C. § 1307(d).

## IV. Conclusion

The evidence, testimony, and schedules indicate Debtors have the ability to repay a significant portion of their debt. In ad-

dition, other facts exist in this case which amount to bad faith on the part of Debtors in this Chapter 7 filing. The fact that Debtors currently appear ineligible under Chapter 13 does not alter the analysis. Therefore, Debtors are unable to show good cause why their Chapter 7 case should not be dismissed under Section 707(b) for substantial abuse, and the presumption of granting them relief has been overcome.

Debtors will be allowed a brief time within which to move to convert their case to a case under Chapter 11. In the absence of such a conversion, Debtors' Chapter 7 petition will be dismissed. Creditor's motion to convert to Chapter 11 (Docket No. 7, as orally modified) will be denied.

A separate order will be entered.